NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SOUTHBRIDGE SHEET METAL
WORKS, INC., Respondent.

No. 6875.

United States Court of Appeals
First Circuit.

July 17, 1967.

Warren M. Davison, Washington, D. C., Atty., with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Vivian Asplund, Washington, D. C., Attorney, were on brief, for petitioner.

George H. Mason, Worcester, Mass., with whom Richard Robinson, Worcester, Mass., was on brief, for respondent.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

The National Labor Relations Board seeks to enforce an order directing respondent company to desist from coercive conduct in violation of section 8(a) (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1) and to bargain collectively, upon request, with Sheet Metal Workers' International Association, Local 127, AFL–CIO, as the exclusive bargaining representative for respondent's production and maintenance employees. The Board affirmed the Trial Examiner's findings that the refusal to bargain charge under section 8(a) (5) was substantiated by a campaign of conduct in violation of section 8(a) (1) calculated to undermine the majority status which the union had achieved through a card-soliciting effort in July of 1964.

The procedural history of this particular conflict is a tortuous one. In July 1964, the union began a card campaign among the thirty-four nonclerical employees of respondent's plant. By July 29, twenty-one had signed cards and the union requested a meeting with the com-

pany to discuss preliminaries to negotiation. After several abortive exchanges in which the company questioned majority status and suggested an election, and the union offered to submit the cards to an impartial person for a card count, the union filed an unfair labor practice charge on August 28, then withdrew the charge and petitioned for an election. A consent election was held on October 13, the union losing by a 19–16 vote. On union objection the Regional Director conducted an investigation and, on November 13, recommended that the election be set aside. On November 19, the union filed an unfair labor practice charge which was substantially identical to the earlier charge of August 28. The company filed exceptions to the Regional Director's findings in the representation proceedings and requested a formal hearing. The Board, on December 28, 1964, adopted the Regional Director's report, set aside the election, and directed that a second election be held. In April 1965, the union requested and was granted permission to withdraw its petition for certification, complaint issued, and a Trial Examiner proceeded to conduct a hearing on the union's unfair labor practice charges. His findings for the union were affirmed by the Board.

Respondent resists enforcement on four grounds: that the union waived the unfair labor practice charges by seeking an election; that the election was improperly set aside; that even if it was not, the Board's finding that the employer violated section 8(a) (5) by refusing to bargain is not supported by substantial evidence; and that the Board was incorrect in finding that a post-election, pre-hearing questionnaire submitted to employees by the company violated section 8(a) (1).[1]

■ The first ground asks us to reject the principle readopted by the Board in Bernel Foam Prods. Co., 146 N.L.R.B. 1277 (1964); see also Irving Air Chute Co., 149 N.L.R.B. 627 (1964), aff'd, 350

F.2d 176 (2d Cir. 1965), that, after losing an invalid election, a union may still press charges under section 8(a) (5) for employer conduct before the election. But we find persuasive the reasons given in Bernel Foam for refusing to relegate the union to a new election as its sole remedy. Furthermore, we have recognized that a violation of section 8(a) (5) does not "cease to become such by the union's filing a certification petition or by its dismissing it." NLRB v. Whitelight Prods., 298 F.2d 12, 14 (1st Cir.), cert. denied, 369 U.S. 887, 82 S.Ct. 1161, 8 L.Ed.2d 288 (1962). We see no sound principle for allowing a union to dismiss a certification petition before election and seek a bargaining order on the basis of a prior unlawful refusal to bargain, but denying it the same privilege after an election that has been voided by employer misconduct.

■ The respondent, however, argues that the union should be barred when it loses a valid election, and that the election here was in fact valid because the Board improperly set it aside. With the substantive principle suggested we can agree. No sound reason suggests allowing the union bargaining recognition when it goes to and loses an election untainted by employer interference. See Wholesalers Coop. Trucking Ass'n., 157 N.L.R.B. No. 120 (Apr. 8, 1966); Koplin Bros. Co., 149 N.L.R.B. 1378 (1964). Nor are we impressed by the Board's contention that this defense is not available to the employer because the order setting aside the election is unreviewable under section 9(d), 29 U.S.C. § 159(d). It is undeniable that the Board's decision in a representation proceeding cannot be reviewed until a bargaining order is issued on the basis of that decision. E. g., Daniel Const. Co. v. NLRB, 341 F.2d 805, 810 (4th Cir.), cert. denied, 382 U.S. 831, 86 S.Ct. 70, 15 L.Ed.2d 75 (1965). But we are here reviewing an order to bargain that, under the Board's own rulings, *Wholesalers*

1. All other findings of conduct in violation of section 8(a) (1) were not excepted to and thus are not before us.

*Coop. Trucking Ass'n,* supra, should not have been issued if the election were not properly set aside. To construe the statute as denying review on this issue solely because the order is not the direct result of a union certification would be to make the certification proceeding conclusive in every case where *Bernel Foam* applies, a result that Congress surely did not and could not intend.

Nevertheless, it appears that the respondent did not properly raise this defense before the Board in the 8(a) (5) proceeding, and thus is barred from raising it before us now. National Labor Relations Act § 10(e), 29 U.S.C. § 160 (e); cf. Elm City Broadcasting Corp. v. NLRB, 228 F.2d 483 (2d Cir. 1955). That respondent excepted to the Regional Director's report and sought a hearing from the Board in the representation proceeding is not sufficient to save the issue for review, because it did not fairly put the Board on notice that the asserted validity of the election was to be posed as a defense to the 8(a) (5) charge. The issue was not raised at all before the Trial Examiner or before the Board in its review of the Trial Examiner's decision; it appears for the first time in respondent's brief in this court. Respondent argues that the Board's policy would have required it to exclude the defense as having been conclusively decided in the representation proceeding. Whether this is a fair prediction is irrelevant, for the Board was never given the opportunity to decide whether the alleged policy applied to this case.[2] Nor was it apprised that it would have to meet the issue in argument on the petition for enforcement. Therefore, we must hold that respondent has effectively waived objection to the propriety of setting aside the election.

Coming to the substance of the 8(a) (5) charge, we confront respondent's allegations that 18 of the 21 authorization cards which had been obtained by the union were invalid. Fifteen cards are challenged by reason of an invalid restriction appearing on their face; six of these cards and three additional cards (not containing the invalid restriction) are challenged because of alleged misrepresentations made in soliciting them.

The cards signed by fifteen of the employees, after setting forth a designation of the union "to represent me and, in my behalf, for the purposes of collective bargaining to negotiate and conclude all agreements in respect to rates of pay, wages, hours of employment, or other conditions of employment * * * ", contained the following restriction on withdrawal:

"The full power and authority to act for the undersigned as described herein supersedes any power or authority heretofore given to any person, or organization to represent me and shall remain in full force and effect for one year from date and thereafter, subject to thirty (30) days' written notice of my desire to withdraw such power and authority to act for me in the matters referred to herein."

This was, as the Board concedes, an invalid restriction.[3] The respondent

2. Requiring reiteration in the unfair labor practice proceedings of a claim pressed in the representation proceeding is by no means an "arid ritual of meaningless form". Staub v. City of Baxley, 355 U.S. 313, 320, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958). Respondent's argument on the merits of the election has two prongs: (a) that the Regional Director's findings that the employer stationed supervisors near the voting area and that a union organizer was not afforded an opportunity to check the eligibility list were not supported by substantial evidence; (b) that the exceptions raised substantial issues of fact making it an abuse of discretion to deny a hearing before the Board. As to (a), the record before us contains no transcript of the evidence before the Regional Director, making review of the evidence impossible. As to (b), if a hearing was required, the appropriate time to seek it was while the hearing was proceeding in the unfair labor practice case, cf. NLRB v. Dallas City Packing Co., 230 F.2d 708 (5th Cir. 1956), not on judicial review.

3. Moreover, we observe that its saturation with legalistic jargon, stopping just

contends that it vitiated these cards since it could have stifled any efforts by signatory employees to withdraw within 30 days after signing—a time span covering the critical period of solicitation before the union's first demand for recognition. We cannot emphasize too strongly our disapproval of such clauses, and we express our hope that the Board will make all feasible efforts to bring about the elimination of such unwarranted representations on authorization cards. It seems to us that so long as the use of cards is countenanced as an alternative to an election, there is the corresponding obligation, on the part of the Board and the unions, to make the cards as clear and straightforward and as little susceptible to misinterpretation as possible. See International Union of Elec. Radio and Mach. Workers v. NLRB, 122 U.S. App.D.C. 145, 352 F.2d 361, 363–364 (concurring opinion of Burger, J.), cert. denied, 382 U.S. 902, 86 S.Ct. 235, 15 L.Ed.2d 155 (1965); cf. NLRB v. Freeport Marble & Tile Co., 367 F.2d 371 (1st Cir. 1966).

■ The presence of this clause has induced us to scrutinize the record for signs of its effect. We have reviewed the testimony of some twenty-two employees and have found no suggestion that the clause had the slightest effect. Only one employee was asked if he understood that his right of withdrawal was restricted, and he answered "No". Under these circumstances, we do not think that respondent has met its burden of showing that employees underwent a change of mind or were prohibited from manifesting it. NLRB v. Greenfield Components Corp., 317 F.2d 85, 89 (1st Cir. 1963). The cards in question here did not contain the type of ambiguity which concerned the court in NLRB v.

Peterson Bros., Inc., 342 F.2d 221, 224 (5th Cir. 1965).

As to the alleged misrepresentations infecting nine of the authorization cards, the Board affirmed the Trial Examiner's findings on the ground that no purposes communicated to the employees purported to be the *sole* reasons for signing the cards. It did not find it necessary to pass upon the Trial Examiner's finding that the employee who allegedly made most of the statements (one Gibeault) was not an agent of the union.

■ After reviewing all of the testimony concerning each of the nine cards, we conclude that the Board's decision must stand. There is no evidence of such a "hard sell" as would overcome the fact of signing a clearcut authorization card. Moreover, the vacillating testimony of employees in the hearing, held almost a year after the organizing campaign concluded and almost eight months after the election, under the scrutiny of company counsel and officials, illustrates the wisdom of requiring fairly strong evidence of misrepresentation and evidence of communication of recantation before cards secured at a much earlier date are adjudged invalid.

■ Robert Therrien, although signing his card the night he received it in the mail, had been told earlier by Gibeault and another employee that there would be an election. Similar statements were made to him from July to October and, of course, ultimately proved accurate. That the earliest of such statements was a motivating force in his decision may be doubted.[4] This factual situation falls far short of those in Englewood Lumber Co., 130 N.L.R.B. 394 (1961), and NLRB v. Koehler, 328 F.2d 770 (7th Cir. 1964). Without go-

---

short of the red ribbon and wax seal, seems likely, if indeed it is not calculated, to have an *in terrorem* effect on the layman employee.

4. The testimony most favorable to respondent reveals a none too successful response to leading questions:

"Q. And you understood from Mr. Gibeault and Mr. Maska that they told you that you were signing a card to have an election in the plant whether a union would represent you or not? A. They said there would be an election, yes."

ing so far as to say that a misrepresentation cannot ever vitiate a card when it is not proffered as a sole reason for signing, we have no hesitation in saying that here the representation that there would be an election does not invalidate Therrien's card. Cf. NLRB v. Gotham Shoe Mfg. Co., 359 F.2d 684 (2d Cir. 1966); NLRB v. Cumberland Shoe Corp., 351 F.2d 917, 920 (6th Cir. 1965).

■ Three other employees (Ethier, Blanchette, and Julian) were told by Gibeault and another employee that they had to sign cards to be enabled to attend union meetings.[5] For all the record discloses, attendance at meetings may have been limited to those who had signed cards. Taking this statement in conjunction with the clear statement of authorization, we fail to see either an inconsistency or an invalidating misrepresentation.

■ Still another version of Gibeault's salesmanship was that he told one Champagne that if he did not sign the card and the union did become the bargaining representative, he would have to pay increased dues. The Board, in its brief, sought to support its findings by asserting that Gibeault was not an agent of the union. But since the Board specifically avoided this ground in its findings, we cannot now resort to it. SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943). The Board's asserted rationale—that any misrepresentation was not expressed as the sole purpose of the cards—does not apply to this one. We think this falls within our ruling in NLRB v. Gorbea, Perez & Morell S. en C., 300 F.2d 886 (1st Cir. 1962); same, 328 F.2d 679 (1st Cir. 1964), and that the Board's finding as to this card is not supported by substantial evidence.

The remaining four cards—those of Liberty, Rischitelli, Hevey, and Bilinski —pose no meritorious issue. Liberty testified only that Gibeault asked if he had signed his card. Rischitelli, unable to speak or understand English, signed his card after his daughter had said to him that the union was "good" for employees. Hevey had been approached by Gibeault, but only to ask what side he was on. And Bilinski, whom Gibeault told to sign his card, said others had told him that the purpose of the card was to have the union represent him. Nothing is added by the fact that an employee received a leaflet saying that no one would know who signed the card. Nor is it significant that five employees stated on the witness stand that they had changed their mind about the union, since they never communicated their decision to any union official.

■ We conclude that twenty of the twenty-one cards are beyond successful attack. The bargaining unit was found by the Board to consist of thirty-four employees. Respondent would add two clerical employees and a part-time worker. We do not see that the question of the clerical workers is before us. As for the part-time employee—who did not work for the company from June 5 to August 7, 1964, whose employment thereafter was not established in any detail, and whose participation in any fringe benefits was left a matter for conjecture —the Board was within its power to exclude him from the unit. In any event, the inclusion of all three would still leave the union with a valid majority.

The 8(a) (1) pre-election conduct, no longer in dispute, following all too conventional a pattern, was clearly a sufficient basis for the Board's finding that respondent did not doubt the union's majority status in good faith. While we now finally sustain the Trial Examiner and the Board, the cynic may well observe that respondent's tactics have successfully held off collective bargaining for at least three years.

5. Gibeault testified that at no time did he, in passing out cards, tell anyone what the purpose of the cards was. But since the Trial Examiner did not rest his findings on the superior credibility of Gibeault, we must take the testimony of the other employees as it appears.

As for the only 8(a) (1) charge remaining in issue, that concerning a questionnaire submitted to respondent's employees, we sustain the Board's finding on the basis of the one question asked which we think could bear no relation to the proper preparation of a case for hearing. The question was: "If you signed a card did you ever change your mind about it?" Although this was followed immediately by the relevant question "If so, did you ever tell anyone about it?", there was no need to ask the preliminary question. While employees were instructed that they need not answer, they were convened, in groups of four or five, at the instruction of the president. To request an employee to describe his present state of mind, whether by admitting a continued loyalty to the union or by a refusal to answer, could be found to be coercive under the circumstances. Joy Silk Mills v. NLRB, 87 U.S.App.D.C. 360, 185 F.2d 732, 743 (1950). Since the Board's order and the notice required to be posted prohibit only interrogation in general, we need not review the other alleged defects in the questionnaire.

A decree will be entered enforcing the order of the Board.