**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ARROW ELASTIC CORPORATION, Respondent.**

No. 77–1395.

United States Court of Appeals, First Circuit.

Argued Jan. 3, 1978.

Decided April 6, 1978.

David A. Fleischer, Atty., Washington, D. C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Michael S. Winer, Atty., Washington, D. C., were on brief, for petitioner.

Jason Berger, Boston, Mass., with whom Snyder, Tepper & Berlin, Boston, Mass., was on brief, for respondent.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

The chief issue in this case is whether the Board's finding that the employer violated section 8(a)(1) of the National Labor Relations Act, 28 U.S.C. § 158(a)(1), by announcing the establishment of a pension plan under circumstances calculated to influence the outcome of a pending representation election is supported by substantial evidence and correct as a matter of law.[1]

Arrow Elastic Corporation of Springfield, Massachusetts, is one of four companies with common ownership and similar employee benefits engaged in the manufacture of elastic webbing and related products. International Ladies' Garment Workers' Union, AFL–CIO, began an organizational campaign at the company's plant in early 1976 which culminated in an election on May 6.

---

1. The Board's decision and order appear at 230 NLRB No. 23. The order set aside an election for bargaining representative and required Arrow Elastic Corporation, the employer, to conduct a second election. It also adopted the administrative law judge's recommended cease and desist order and posting requirements, *in-*

*ter alia,* which directed Arrow to refrain from "[a]nnouncing new benefits to employees under conditions calculated to influence employees in the exercise of their right to choose freely whether or not they wish to be represented by a labor organization."

On May 4, 1976, the president of the company, Robert Kingsbury, gave separate speeches to the employees on each of two shifts informing them that a fixed pension plan would be added to the existing profit-sharing program, that there would be a general wage increase of fifteen cents per hour effective August 1, and that the employees would receive an additional holiday.

Kingsbury stated candidly, "I spoke to the people because there was going to be a union election and I wanted to win it."

The record discloses that the assistant plant manager, Kasimierz Moszynski, was told at a January executive meeting to spread the word that there would be an extra holiday and pension plan. He was asked to find out from the employees what day they wanted for a holiday, but was given no details of the pension plan except that the company was working on it. "Kaz" told approximately twelve or fourteen employees of the two new benefits with the understanding that they would tell others, many of whom did not speak English. There is no question but that the method of dissemination was generally effective, and, with regard to the extra holiday, the administrative law judge so held.[2]

At the outset of the hearing before the administrative law judge, the General Counsel offered three stipulations:

One, the Employer has a policy of granting an annual wage increase on or about August 1 of any given calender [sic] year. This policy was promulgated in 1974. In August of 1974 employees received an increase of 10¢ per hour. In August of 1975 employees received an increase of 10¢ per hour and in August of '76 employees received an increase of 15¢ per hour.

.     .     .     .     .

[Two,] the Employer began developing a pension program which included a life insurance benefit in 1975. The decision to implement said benefit was made in 1975. Said decision was made without knowledge of union activity.

[Three,] the Employer decided to grant a ninth paid holiday in January, 1976. The decision to grant said holiday was made without knowledge of union activity.

The Board found that the announcement of the wage increase and the additional holiday did not violate the Act because the company had an established policy of granting pay increases on August 1 of every year and because most of the employees became aware in January that there would be an additional holiday.

Arrow's first line of attack is that the stipulation foreclosed any determination by the administrative law judge and the Board that the pension plan was not predetermined. We do not read the stipulation to mean that the pension plan had been finalized in 1975. Under the circumstances, the Board had a duty to determine the status of the pension program in January and May of 1976. The stipulation meant what it said; the employer had decided in 1975 to implement a life insurance benefit as part of a pension program. Moreover, as we shall develop later, we do not think the Board's finding rises or falls solely on the question of when the plan was determined.

■ Just recently in *NLRB v. South Shore Hospital,* 571 F.2d 677 (1st Cir. 1978), we reiterated the general rule that promises of benefits made by the employer just prior to a Board's certification election for the purpose of influencing the election are unfair labor practices under section 8(a)(1).[3]

**2.** The administrative law judge found:

"Credible evidence established that the decision in this respect was made known to employees in January, with the only detail left open, being the particular day on which employees elected to take the new holiday. The determination and communication to employees of this new benefit, in my opinion, was made under circumstances which reduced

the ninth paid holiday to a term of employment, prior to the May 4 speeches, and before any organizational activity occurred . . . ."

The Board adopted the administrative law judge's findings.

**3.** In *South Shore Hospital,* we held that a statement that nonunion employees would get the same benefits as union employees in answer to

See *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); *D'Youville Manor v. NLRB*, 526 F.2d 3 (1st Cir. 1975); *NLRB v. Styletek*, 520 F.2d 275 (1st Cir. 1975); *NLRB v. Sandy's Stores, Inc.*, 398 F.2d 268, 270 (1st Cir. 1968); *Casey Manufacturing Company and United Shoe Workers of America, AFL–CIO*, 167 NLRB 89 (1967).

■ In this case Arrow contends that it comes within an exception for "pre-determined" benefits and cites *Schwab Foods, Inc.*, 223 NLRB 394, 397–398 (1976); *Big G Supermarket*, 219 NLRB 1098, 1108 (1975); *Domino of California, Inc.*, 205 NLRB 1083, 1086–1087; *Sanford Finishing Corp.*, 175 NLRB 366 (1969); *Southbridge Sheet Metal Works*, 158 NLRB 819 (1966), aff'd, 380 F.2d 851 (1st Cir. 1967); and *NLRB v. Tommy's Spanish Foods, Inc.*, 463 F.2d 116, 119 (9th Cir. 1972). On analysis, we find that this line of cases is distinguishable on the

grounds that the benefits there were "pre-determined" in the sense that they were already existing or that the employers had made a binding commitment to put the benefits into effect regardless of the outcome of the election.[4] Here, Arrow did not become legally committed to a pension plan until September 10, 1976, when its Board of Directors adopted the specific program by executing an agreement with the carrier. The formal adoption of the pension program was not, as Arrow suggests, only a paper formality; until the plan was signed, Arrow was free to abandon its program at any time or to alter the provisions of it. No specific provisions of the program had been announced by May 4. Furthermore, even assuming the details were *in esse* and pre-determined before May 4, the Board could infer from the company's failure to reveal any of the details until election eve, that it was deliberately delaying the announce-

a question at a meeting held by management and employees to discuss union activities before any petition for an election had been filed was not an unfair labor practice.

4. In *Schwab Foods*, the Blue Cross benefit had apparently been available to the employees for a substantial period of time before the organizing campaign and the company had just not communicated this adequately to its employees. There was already a contract with Blue Cross, and some of the employees were taking advantage of it. *Id.* at 397–398.

In *Big G Supermarket*, "[B]efore the representation petition was filed, Respondent had made arrangements to cover the  . . . market employees by company-paid health insurance  . . .." *Id.* at 1108.

In *Domino of California, Inc.*, the only thing holding up the profit sharing plan was the Internal Revenue Service's approval for tax exemption. The extension of the plan to unit members was made during the campaign, but solely for tax considerations.

*Sanford Finishing* involved a wage increase and an increase in hospitalization insurance benefits. The circumstances relative to the wage increase were similar to this case, and, as here, the Board found there was no violation. The increase in hospitalization insurance benefits was, as here, announced at the same time as the wage increase. The facts show that, unlike this case, the employer had started to make arrangements in November of 1967 and January of 1968 to increase hospital insurance benefits. to become effective at the time of the next regular wage increase—June of 1968.

There was an existing hospital insurance plan, and definite arrangements were made to increase it effective in June of 1968. The announcement of the wage increase and the increase in hospital benefits was made on June 7, 1968.

*Southbridge Sheet Metal* is close. The employees were addressed by an insurance broker, DeGregorio, who told them that the employer had been working on a pension plan, which he described to them. However, he was not able to give the cost of the plan because it had not yet been computed. Union activities did not commence until about a week after this announcement. In finding that there was no violation, the Board, in adopting the opinion of the A.L.J., emphasized that no mention was made of the Union during DeGregorio's speech, and that extensive negotiations had already been conducted on the pension plan, although the company was not contractually obligated at the time of the speech.

*Tommy's Spanish Foods, Inc.*, is most apposite. A month before the petition for election was filed, the employer had begun to explore the possibility of expanding the employees' insurance coverage. After the petition was filed, the employees were told that the company had, prior to union activity, been preparing to improve the insurance program. In finding no violation, the court relied wholly on the dissenting opinion of the Chairman of the Board and made no independent opinion analysis or review of the case law. But even here, there was an insurance program already in existence.

706

ment in order to influence the election. Predetermination alone is not determinative, the timing of the announcement must also be considered. In *Styletek, supra,* 520 F.2d at 280, we noted:

> Wage increases and associated benefits may be well warranted for business reasons; still the Board is under no duty to permit them to be husbanded until right before an election and sprung on the employees in a manner calculated to influence the employees' choice.

In *Exchange Parts Co., supra,* 357 U.S. at 409–410, 84 S.Ct. at 460, the Court said:

> The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged. The danger may be diminished if . . . the benefits are conferred permanently and unconditionally. But the absence of conditions or threats pertaining to the particular benefits conferred would be of controlling significance only if it could be presumed that no question of additional benefits or renegotiation of existing benefits would arise in the future · . . ..

The employer argues that, because the employees were informed of the pension plan and the additional holiday at the same time, they must have been aware of the pension plan in January, which was long before the election. This argument overlooks the fact that the communication to the employees in January concerning the pension plan was barren of detail. In the case of a holiday, the benefit is simple, straightforward, and direct. No explanation is necessary. The particulars of a pension plan, on the other hand, must be understood and studied to determine its value. The assistant plant manager did not have the necessary information to explain the pension plan in January. The May 2 speech by Kingsbury did not give any more detailed information about it. It was an unspecified promise of benefits to which the

company had not yet made a formal, legal commitment. In light of the concerns expressed in *Exchange Parts, supra,* 375 U.S. at 409–410, 84 S.Ct. at 460, that "the benefits are conferred permanently and unconditionally" and that "no question of additional benefits or renegotiation of existing benefits would arise in the future" the status of the plan and the timing of its announcement made it vulnerable.

■ We find that there was substantial evidence to support the Board's finding of an unfair labor practice.

The remaining issue is whether the Board abused its discretion in not reopening the record to allow Arrow to submit copies of union campaign letters which focused on the failure of Arrow to have a pension plan.

The hearing was closed on October 21, 1976, and the administrative law judge's decision was rendered on January 21, 1977. The motion to reopen the record was not made until February 18, 1977. In reply to Arrow's contention that it did not have possession of the letters at an earlier time, the Board found:

> The union campaign letters were both clearly part of the Union's election campaign which ended in May 1976, more than 5 months before the hearing. The letter from Respondent's insurance agent is dated April 26, 1976 more than 5 months before the hearing date. Thus, there appears to be no reason why Respondent could not have submitted the three letters at the hearing . . . nor is there any showing that the three letters were somehow unavailable to Respondent at the time of the hearing.

· [4] We are constrained to add that, if Arrow were truly unaware of the union campaign letters, it cannot now take the position that the speech was merely in response to union allegations. Where there has been no showing that the material was unavailable, we must affirm the Board in this exercise of its discretion. *See NLRB v. Yale Manufacturing Company,* 356 F.2d 69, 71–72 (1st Cir. 1966).

*The Board's decision and order are to be enforced.*