STRUTHERS–DUNN, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 77–1479.

United States Court of Appeals, Third Circuit.

Argued Jan. 5, 1978.

Decided April 12, 1978.

Robert E. Wachs, Daniel C. Cohen, Wolf, Block, Schorr and Solis-Cohen, Philadelphia, Pa., for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, Mary Schuette, N. L. R. B., Washington, D. C., for respondent.

Before ROSENN, HIGGINBOTHAM, Circuit Judges and VanARTSDALEN, District Judge.*

## OPINION OF THE COURT

VanARTSDALEN, District Judge.

The National Labor Relations Board (NLRB or Board) by order dated February 9, 1977, directed Struthers-Dunn, Inc. (Struthers-Dunn), to recognize and upon request to bargain with Local 1973, International Brotherhood of Electrical Workers, AFL–CIO–CLC (the Union), as the exclusive bargaining agent for the production and maintenance employees (excluding clerical and certain other employees) of the Struthers-Dunn plant in Manchester, New Hampshire. Struthers-Dunn, having its principal place of business in Pitman, New Jersey, petitioned this court for review of this bargaining order pursuant to section 10(f) of the National Labor Relations Act, 29 U.S.C. § 160(f) (1970). The NLRB filed a cross-petition for enforcement of that order.

By written stipulation filed of record, the findings of the NLRB with respect to certain unfair labor practices of the employer and other factual matters are not contested and may be adopted by the court. Hence, the sole issue before us is the propriety of the NLRB's bargaining order. Because we do not believe circumstances justifying the issuance of a bargaining order exist under the guidelines of *NLRB v. Gissel Packing Co., Inc.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the application for an enforcement order will be denied, the bargaining order vacated, and the case remanded to the Board to determine whether to direct and conduct a representation re-election.

### I.

On March 6, 1975, Robert Fisher (Fisher), president of the Union, met in Manchester with five of the Struthers-Dunn employees of the Manchester plant.[1] He told them that in order to obtain union recognition he would need signed union authorization cards. He further explained that although Struthers-Dunn might grant the union recognition on the basis of authorization cards signed by a majority of the employees, such recognition was not often granted by management, and that the cards would probably have to be presented to the NLRB to invoke its processes for recognition, including an election. Fisher specifically told those present at the meeting that "anyone who signed a card remained free to change his mind and withdraw it." All of the five employees present signed cards, and Fisher delivered to them a quantity of blank cards in order to solicit and return to him signed authorizations from other employees.

By the morning of March 12, 1975, Fisher had in his possession a total of 43 signed cards.[2] On that date, the Manchester plant

---

* Donald W. VanArtsdalen, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. The employees at the Struthers-Dunn main plant in Pitman, New Jersey, have had union representation for approximately 20 years; however, those employees at the Manchester, New Hampshire plant, have never been represented by a union. Struthers-Dunn has owned and operated the Manchester plant for at least ten years.

2. There is no finding of record that Fisher had any direct communication with any employees other than the five who attended the meeting on March 6, 1975; nor that any signers of the cards other than the five attending the meeting

had 64 employees in the proposed bargaining unit. Fisher thereupon telephoned the Manchester plant manager, introduced himself, advised that he had in his possession a card majority and demanded recognition of the Union as the authorized collective bargaining representative. The plant manager refused to recognize or bargain with the Union at that time.

On the same day as the demand for recognition was made, the Union sent a representation petition to the regional office of the NLRB, pursuant to section 9(c)(1) of the National Labor Relations Act, 29 U.S.C. § 159(c)(1) (1970), seeking a representation election. This was followed by a transmittal to the regional office on March 14, 1975, of 44 signed authorization cards which by that time had been received by the Union. Two additional signed authorization cards were later received.

On March 19, 1975, the regional office of the NLRB received a statement dated March 14, 1975 and signed by 17 of the Manchester plant employees who would be within the proposed bargaining unit, and of whom 16 had signed and delivered authorization cards. The statement read:

> We the undersigned have signed cards petitioning a Union into Struthers-Dunn, Inc. We now feel that we would like to withdraw our names from any such petition.[3]

The signatories to the statement took no steps to inform Fisher or any official or other representative of the Union of their desire to withdraw the authorizations, and there is no finding that any of the employees who signed the cards were ever advised by anyone as to any required procedure for withdrawing an authorization, once given. In addition, there is no finding that the Union was aware of the statement until long after it was received by the NLRB, and no finding that the NLRB ever took any steps to advise the Union of receipt of the statement.

On March 25, 1975, Struthers-Dunn and the Union entered into a stipulation for a representation election to be held by consent, and the election was held April 25, 1975. The Union lost the election by a vote of 31 to 21, and it promptly filed with the NLRB objections to the election and unfair labor practice charges against Struthers-Dunn. A complaint issued July 8, 1975. On August 1, 1975, Struthers-Dunn granted a general wage increase, whereupon the complaint was amended, alleging the general wage increase as an additional unfair labor practice, and seeking, as alternative relief to the prior requested re-election, a bargaining order directing Struthers-Dunn to recognize and on request bargain with the Union as the authorized collective bargaining representative of the employees.

The NLRB found multiple unfair labor practices committed by Struthers-Dunn commencing on March 25, 1975,[4] including section 8(a)(1) violations and a refusal to bargain in violation of section 8(a)(5).[5]

---

were advised of the right to withdraw an authorization after it was given.

3. There is no contention that the statement was equivocal or ambiguous, or that it was for any purpose other than to withdraw authorizations theretofore executed by the 16 signatories.

4. Although the petition alleged, and there was some evidence produced, concerning violations commencing as early as March 11, 1975, the Administrative Law Judge expressly rejected giving credence to this testimony and the NLRB in its final order dated February 9, 1977 directed union recognition, effective from the date beginning March 25, 1975, "the date on which Respondent [Struthers-Dunn] embarked on a clear course of unlawful conduct."

5. 29 U.S.C. §§ 158(a)(1), (a)(5) provide:

§ 158. *Unfair labor practices*
(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

. . . . .

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
The decision and order of the NLRB does not specify the date of the section 8(a)(5) violation. Footnote 4 (*Appendix*, p. iii) notes that the Administrative Law Judge made no finding as to such a violation, and that the NLRB's 8(a)(5) determination was based on *Trading Port, Inc.*, 219 NLRB 298 (1975). Presumedly, NLRB determined the date to be the date of the first of the section 8(a)(1) violations on March 25,

The NLRB, as a part of its final order, directed Struthers-Dunn to cease and desist certain specified activities and to post certain notices to employees. In addition, it issued the contested bargaining order by directing Struthers-Dunn to

a) Recognize, effective from the date beginning March 25, 1975, and upon request, bargain collectively and in good faith with Local 1973 . . . as the exclusive representative of all of the employees in the following appropriate unit.
. . .

## II.

The authority of the NLRB to issue a bargaining order in the absence of a certified election or employer recognition of the union as collective bargaining agent is founded upon *NLRB v. Gissel Packing Co., Inc.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). In *Gissel* the Supreme Court defined three categories of cases to be considered in determining whether the issuance of such a bargaining order is appropriate. As summarized in *NLRB v. Armcor Indus., Inc.*, 535 F.2d 239 (3d Cir. 1976), these categories are:

First, in "exceptional cases" marked by "outrageous" and "pervasive" unfair labor practices which eliminate the possibility of holding a fair election, a bargaining order may issue even without a showing that the union at one point had a card majority. . . . Second, in "less extraordinary cases marked by less pervasive practices," where there is a showing that the union at one point had a card majority, the Board may issue a bargaining order when it concludes that the extensiveness of the employer's unfair labor practices "have the tendency to undermine majority strength and impede the election processes." . . . Finally, when the unfair labor practices are minor and less extensive and have only a minimal impact on the election process, no bargaining order may issue. . . .

*Id.* at 244, *quoting Gissel, supra* (citations omitted). The Administrative Law Judge (ALJ) explained his reasons for recommending a bargaining order, as follows:

Although Respondent was clearly within its rights in refusing to recognize the Union when it did, its subsequent preelection conduct prevented the election from reflecting the free will of the employees, and the election must therefore be set aside. Moreover, those unfair practices together with the general wage increase of August 14 were so extensive and serious as to render unlikely a fair and free election in the future. Cf. *Oahua Refuse Collection Co., Inc.*, 212 NLRB 224, 230; *Tower Enterprises, Inc. d/b/a Tower Records*, 182 NLRB 382, n.2. In such circumstances, a bargaining order is warranted if the Union had card authorizations to bargain from a majority of employees in the unit. *N.L.R.B. v. Gissel Packing Co.*, 395 U.S. 575, 600, 610–611, 614–615, 89 S.Ct. 1918, 23 L.Ed.2d 547. The Union did in fact possess such cards from approximately two-thirds of the unit employees by the time of the bargaining demand and refusal.

The NLRB affirmed the rulings, findings and conclusions of the ALJ and adopted his recommended order, with the modification that the bargaining order be effective retroactively to the date of March 25, 1975, based on its decision of *Trading Port, Inc.*, 219 NLRB 298 (1975).

Giving the bargaining order retroactive effect in this case is a remedy not supported by the caselaw. In *Trading Port, supra*, the NLRB issued a bargaining order retroactive to the date of demand by the Union for recognition, based on the Union's solicitation and receipt of signed authorization cards from more than one-half of the employees of the proposed bargaining unit. Unlike the present case, the NLRB in *Trading Port* found that the unfair labor practices and course of unlawful conduct commenced *prior* to the demand for union rec-

---

1975, to which date the bargaining order was made retroactive. Footnote 4 notes the minority view of Board member Jenkins that the

section 8(a)(5) violation, by reason of the subsequent section 8(a)(1) violations, occurred on the date of demand, March 12, 1975.

ognition. In the present case, the unfair labor practices not only commenced after the demand for recognition, but after a sufficient number of employees who had signed cards expressed in writing to the NLRB their desire to withdraw such authorization. As a result, the Union was no longer the expressed choice of the majority of the employees.

The Union held a majority status, by reason of the execution of the authorization cards, as of the time of demand for recognition on March 12, 1975. However, the NLRB found that the first unfair labor practice and the date on which Struthers-Dunn embarked on a clear course of unlawful conduct was March 25, 1975. If the March 19 withdrawal statement signed by the 16 employees was effective, the Union lost its status as a representative of a majority of the employees through no unlawful act or unfair labor practice of Struthers-Dunn.

In *Gissel* the Supreme Court said:

> The Board's authority to issue such an order on a lesser showing of employer misconduct is appropriate, we should re-emphasize, where there is also a showing that at one point the union had a majority; in such a case, of course, effectuating ascertainable employee free choice becomes as important a goal as determining employer misbehavior.

395 U.S. at 614, 89 S.Ct. at 1940. The ALJ, in the instant case, interpreted the above quote quite literally to mean that if at *any* point in time the Union represented a majority of the employees, it would make no difference whether there was a subsequent loss of such majority status prior to any misconduct by the employer. We think such an interpretation fails to consider the important goal of "effectuating ascertainable employee free choice."

The Board, in dealing with the effect of the withdrawal statement, took a somewhat different position from that of the ALJ; it concluded that the withdrawal statement was totally ineffective. The Board reasoned there is a "well-established rule that an authorization card cannot be effectively revoked in the absence of notification to the Union prior to the demand of recognition", and ruled, therefore, that the withdrawal statement did not deprive the Union of its status as majority representative. The Board concluded that the Union was the choice of the majority as of the date of the first unfair labor practice on March 25, 1975. In support, the NLRB cited *James H. Matthews & Co. v. NLRB*, 354 F.2d 432 (8th Cir. 1965), *cert. denied*, 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966); *NLRB v. Southbridge Sheet Metal Works, Inc.*, 380 F.2d 851 (1st Cir. 1967); *NLRB v. Priced-Less Discount Foods, Inc.*, 405 F.2d 67 (6th Cir. 1968).

The cases cited are distinguishable. In *James H. Matthews & Co., supra*, the employee in question signed an authorization card. Later the union received a letter, postmarked 11 days after the effective date for determining majority status of the union, requesting return of the employee's authorization card. Allegedly, the letter was neither written, dated, nor addressed by the employee and was originally left with an undisclosed person. The court of appeals, in holding the withdrawal ineffective, relied upon the agency doctrine that a principal's revocation of his agent's authority is ineffective until communicated to the agent.[6] We are not here concerned with whether, subsequent to the execution or delivery to the NLRB of the withdrawal, actions that might have been taken by the Union on behalf of those who had signed authorization cards would be valid and effective. We are concerned with the important goal of effectuating ascertainable em-

---

**6.** The court placed express reliance upon Restatement (Second) of Agency § 119(c). Section 119(c) refers specifically to Restatement (Second) of Agency § 11 which provides various types of notice including:

(iv) to a place which, in view of the business customs or the relations between the parties,

is reasonably believed to be the place for the receipt of such communications by the other.

Even under a pure agency doctrine, the notice sent to the NLRB in the instant case might be found under § 11(iv) to likewise be proper notice to the Union.

ployee free choice. *Gissel, supra*, 395 U.S. at 614, 89 S.Ct. 1918.

There were multiple contentions of invalidity of various signed authorization cards in *Southbridge Sheet Metal Works, Inc., supra*. The court of appeals in *Southbridge* noted that five employees testified under oath they had changed their minds about the union, but the court found this insignificant because those employees "never communicated their decision to any union official." 380 F.2d at 856. More importantly, there was no evidence adduced that these employees ever communicated or notified *anyone* including the NLRB of a change of mind prior to the hearing.

In *NLRB v. Priced-Less Discount Foods, Inc., supra*, the letters of withdrawal were solicited by the employer, written on company paper, and mailed in envelopes with the postage paid or furnished by the employer. The court of appeals characterized these activities as "flagrant unfair labor practices", and concluded that the employer's unfair practices reduced the union majority. 405 F.2d at 71. The court, therefore, enforced a bargaining order to restore the positions of the parties "as they existed before the occurrence of the unfair labor practices." *Id.* at 70. In the present case, prior to any unfair labor practices by Struthers-Dunn, the Union ceased to have majority support of the employees after the 16 employees withdrew their prior authorizations. There is no contention that the withdrawals were other than free and voluntary expressions of choice, uninfluenced by any activity by the employer, either lawful or unlawful.

Under the facts of this case, we think the determination by the NLRB that the Union continued its status as majority representative up until at least March 25, 1975, due to the failure of the 16 employees to notify the Union of their withdrawal of authorization, fails to accord proper recognition to the free and voluntary expression of opinion by the employees. The president of the Union expressly informed the five employees with whom he met and distributed authorization cards that anyone who signed a card remained free to change his (or her) mind and withdraw it. He imposed no time limitation or condition to that statement so far as the record discloses. He further advised the five employees that the cards would probably have to be presented to the NLRB in order to secure recognition through an election. He made no explanation as to the proper method to utilize in order to withdraw an authorization, or that the Union would have to be notified in order to make withdrawal effective. The written notice was received by the NLRB while it had possession of the authorization cards, before any unfair labor practice was committed by Struthers-Dunn, and before the stipulation of a consent election was executed. The NLRB itself never took any steps to notify the Union of the receipt of the withdrawal statement, although we do not intimate there was any requirement to do so.

The Board in its brief relies upon a bargaining order retroactive to the date of demand for recognition that was upheld in *Ann Lee Sportswear, Inc. v. NLRB*, 543 F.2d 739 (10th Cir. 1976). There, however, section 8(a)(1) and 8(a)(2) violations were found commencing as of the date of demand for recognition, at a time when the union held signed authorization cards from a majority of the employees, and the later defection was brought about by the employer's violations.

The ALJ in the present case properly noted that *Gissel* requires "a showing that at one point the union had a majority." 395 U.S. at 614, 89 S.Ct. at 1940. The *Gissel* Court further required in the less extraordinary case, such as the present, that the unfair labor practices "nonetheless still have the tendency to undermine majority strength and impede the election process." *Id.* We fail to see how the unfair practices, found to have commenced on March 25, 1975, could have had a tendency to undermine majority strength which was, at that time, nonexistent. By at least March 19, 1975, when the withdrawal statement was received by the regional office of the NLRB, majority strength, as expressed by the will of the employees, ceased to exist.

802

The caselaw is clear that the preferred remedy is a free election. In *Gissel*, the Court stated:

> The Board itself has recognized, and continues to do so here, that secret elections are generally the most satisfactory—indeed the preferred—method of ascertaining whether a union has majority support.

*Id.* 395 at 602, 89 S.Ct. at 1934. This court in *NLRB v. Eagle Material Handling, Inc.*, 558 F.2d 160 (3d Cir. 1977), reiterated that policy by recognizing " 'the general and highly desirable practice in industrial relations of selecting bargaining representatives through traditional election processes.' " *Id.* at 166, *quoted in NLRB v. Craw*, 565 F.2d 1267, 1271 (3d Cir. 1977). An appropriate remedy in this case would be a re-election.

We do not hold that in every case, before a bargaining order may be entered in a *Gissel* "less extraordinary" category, majority strength of the union must exist when the unfair labor practices by the employer commence. In this case, once-existing majority strength was dissipated through no activity by the employer and prior to any employer violations. Absent any showing that the employer's activities in some way unlawfully undermined union majority strength, the bargaining order cannot be sustained.

The NLRB's petition for enforcement of the bargaining order is denied and the bargaining order is vacated. Because the NLRB did not act on the request for a re-election, the case is remanded to the NLRB to determine whether to direct a re-election.[7]

---

7. At oral argument, Struthers-Dunn did not contest the findings of unfair labor practices by it, and conceded that a re-election would be an appropriate remedy.