Public Employee Labor Relations Board
No. 94-279

APPEAL OF SULLIVAN COUNTY

(New Hampshire Public Employee Labor Relations Board)

June 3, 1996

*Constance N. Stratton*, assistant county attorney, of Newport, by brief and orally, for the petitioner.

*Craig, Wenners, Craig & Casinghino, P.A.*, of Manchester (*Vincent A. Wenners, Jr.* on the brief and orally), for the respondent.

HORTON, J. The petitioner, Sullivan County (county), appeals the decision of the New Hampshire Public Employee Labor Relations Board (PELRB) that the petitioner committed an unfair labor practice by unilaterally implementing personnel benefit changes affecting non-bargaining unit employees who had initiated union certification proceedings. We reverse.

In March 1993, the human resource manager for Sullivan County sent a memorandum to the Sullivan County Commissioners (commissioners) recommending wage and benefit changes for non-union employees. The recommended changes included eliminating "step" pay increases, reducing sick time buy-backs, reducing the total number of personal days and holidays, and implementing an "earned time" program. In May 1993, the commissioners announced the wage and benefit changes to take effect on July 1, 1993, and met with the non-union employees to explain the changes in detail. In June 1993, the commissioners decided to postpone implementation of the changes pending approval of the 1994 fiscal year budget. On July 26, 1993, the respondent, AFSCME, Council 93, Local 3438, Sullivan County Support Services (union), filed a petition for certification with the PELRB, admittedly in response to the proposed changes. One month later, after budget approval, the commissioners implemented the wage and benefit changes.

On October 14, 1993, the union filed an unfair labor practice complaint with the PELRB arguing that the county's actions violated RSA 273-A:5, I(a), (b), (c), and (i) (1987) by unilaterally modifying existing employment conditions while a petition for certification was pending. Later that month, the PELRB granted the petition for certification and designated the union as the exclusive representative of the bargaining unit. In December 1993, the PELRB found "the conspicuousness and severity of the unilateral changes to have been so broad and far-reaching across the entire range of petitioned-for employees that they constitute[d an unfair labor practice] in violation of RSA 273-A:5[,] I (a) and (b)." The PELRB directed the county to return to the status quo as it existed before the complaint was filed and denied the county's motion for rehearing. This appeal followed.

We defer to the PELRB's findings of fact, and, absent an erroneous ruling of law, we will not set aside the PELRB's decision unless the county demonstrates by a clear preponderance of the

evidence that the order is unjust or unreasonable. RSA 541:13 (1974); *see also Appeal of Town of Rye*, 140 N.H. 323, 326, 666 A.2d 948, 951 (1995).

The county argues that the PELRB erred by finding that the wage and benefit changes constituted an unfair labor practice in violation of RSA 273-A:5, I (a) and (b), because the union failed to prove illegal motivation on the county's part. *See In re General Shoe Corp.*, 77 N.L.R.B. 124, 125 (1948). The union counters that the county has failed to demonstrate that the PELRB's ruling was unjust or unreasonable because the wage and benefit changes affected all the petitioned-for employees, represented a wholesale change in wages and benefits, and destroyed the level playing field required during union certification and elections. In addition, the union argues that federal law does not require a showing of illegal motive, and that those federal cases which do require illegal motive should be distinguished from this case. The union also argues that illegal motive need not be proved because the county's conduct was inherently destructive, or, alternatively, that illegal motive can be inferred because the wage and benefit changes were not officially adopted until after the certification process began.

RSA 273-A:5 prohibits unfair labor practices. It provides, in part:

I. It shall be a prohibited practice for any public employer:

(a) To restrain, coerce or otherwise interfere with its employees in the exercise of the rights conferred by this chapter;

(b) To dominate or to interfere in the formation or administration of any employee organization;

(c) To discriminate in the hiring or tenure, or the terms and conditions of employment of its employees for the purpose of encouraging or discouraging membership in any employee organization;

(d) To discharge or otherwise discriminate against any employee because he has filed a complaint, affidavit or petition, or given information or testimony under this chapter; . . . .

RSA 273-A:5, I(a)–(d) (1987).

█ We begin with our own case law, which provides useful guidance. In cases involving alleged retaliatory discharge, we have recognized that a complainant under RSA 273-A:5, I(a) and (d) must prove illegal motivation at least to some degree.

The only alternative rules would place a burden on an employer to justify his action upon a mere claim of retaliation or upon the complainant's introduction of any evidence of retaliation. In either case there would be no burden of proof at all on the complainant, and the temptation to bring frivolous complaints would be humanly irresistible.

*Appeal of White Mts. Educ. Ass'n*, 125 N.H. 771, 777, 486 A.2d 283, 288 (1984) (citation omitted); *see Appeal of Prof. Firefighters of E. Derry*, 138 N.H. 142, 144–45, 635 A.2d 1352, 1354 (1993).

In *Appeal of the American Federation of State, County and Municipal Employees, AFL-CIO Local 298*, 121 N.H. 944, 437 A.2d 260 (1981), we declined to reverse the PELRB's finding that in order for an employer communication to constitute an unfair labor practice, "it must be established that the statement was illegally applied or intended for illegal reasons." *Id.* at 946, 437 A.2d at 262; *see also Appeal of City of Portsmouth, Bd. of Fire Comm'rs*, 140 N.H. 435, 439, 667 A.2d 345, 348 (1995) (commissioner's comments, absent elements of intimidation, coercion, or misrepresentation, did not constitute an unfair labor practice under RSA 273-A:5, I(a) and (b)). These cases indicate that the union bears the burden to prove some minimal degree of proscribed motivation in order to establish an unfair labor practice under RSA 273-A:5.

The union argues that rather than look to an employer's illegal intent in committing an unfair labor practice, federal courts look to whether an employer engaged in conduct reasonably tending to interfere with the free exercise of employee rights. *See In re Crown Stationers*, 272 N.L.R.B. 164 (1984). The case cited by the union involved a threat by a store manager to fire a worker involved in union activities. *See id.* The manager wrote: "Possibly even if they vote to go union, we can tie it up in legal mumble jumble for 2 years & maybe by then we can get rid of this trouble maker." *Id.* at 167. The union's reliance on *Crown Stationers* is misplaced. The instant case does not involve employer threats based on the union activities of its employees. Rather, it involves changes to the employee benefits package. Even if we were to apply the standard put forth by the union, we cannot say that the benefits changes reasonably tended to "interfere with the free exercise of employee rights." *Id.* at 164.

The union acknowledges that in some cases where an employer has granted or withheld employee benefits in order to dissuade union formation or membership, proof of an employer's

discriminatory intent may be required. *See Textile Workers v. Darlington Co.,* 380 U.S. 263, 275–76 (1965). In such cases, the plaintiff must show, first, that the employer knew or should have known that a union was organizing its employees or a representation election was pending and, second, that benefit reductions or increases were implemented with the purpose of interfering with employee free choice. *See N.L.R.B. v. Styletek, Division of Pandel-Bradford, Inc.,* 520 F.2d 275, 279 (1st Cir. 1975). If the changes were made primarily for a legitimate business purpose, they do not violate the act. *Id.* The union argues, however, that we should adopt exceptions to the general rule recognized by federal courts; *i.e.,* where conduct is inherently destructive such that intent need not be shown, and where intent may be implied due to the peculiar timing of wage and benefit changes.

The union cites *National Labor Relations Board v. Great Dane Trailers, Inc.,* 388 U.S. 26 (1967), to support its argument that proof of discriminatory motive or intent is not required in this case because the county's conduct was inherently destructive. The issue in *Great Dane* was whether, in the absence of proof of an anti-union motivation, the employer committed an unfair labor practice by refusing to pay striking employees vacation benefits accrued under a terminated collective bargaining agreement while at the same time announcing its intention to pay such benefits to scabs, picket-line crossers, and non-strikers who had been at work on a certain date during the strike. *Id.* at 27.

The Court began its analysis by recognizing that the relevant portion of the National Labor Relations Act, 29 U.S.C. § 158(a)(3) (1994), requires that in order for the labor board to declare an unfair labor practice, it first must find "discrimination and a resulting discouragement of union membership." *Great Dane,* 388 U.S. at 32; *see American Ship Bldg. Co. v. Labor Board,* 380 U.S. 300, 311 (1965). The Court stated that discrimination clearly had occurred, and that, without a doubt, the discrimination was capable of discouraging membership in a union. *Great Dane,* 388 U.S. at 32. But inquiry, the Court pointed out, usually does not stop there. There must be a finding that the discriminatory conduct was motivated by anti-union purposes. *Id.* at 33.

The Court did recognize an exception to the rule:

> Some conduct, however, is so inherently destructive of employee interests that it may be deemed proscribed without need for proof of an underlying improper motive. That is, some conduct carries with it unavoidable consequences which the employer not only foresaw but which he must have intended and thus bears its own indicia of intent.

*Id.* (citations and quotations omitted). The Court explained that if the conduct is inherently destructive, the employer has the burden of explaining his actions, from which the board may nevertheless infer improper motive. *Id.* at 33–34. The Court also noted, however, that "when the resulting harm to employee rights is comparatively slight, and a substantial and legitimate business end is served, the employers' conduct is prima facie lawful and an affirmative showing of improper motivation must be made." *Id.* at 34 (quotation and ellipsis omitted).

The union argues that *Great Dane*, and not cases requiring proof of intent, controls this case. The union argues that the wage and benefit changes were inherently destructive because they affected only petitioning employees, were made at a sensitive time, and had the effect of interfering with the employees' right to organize for mutual aid without employer interference. The union argues that the changes destroyed the level playing field considered vital to maintaining a fair campaign and election environment. *See General Shoe Corp.*, 77 N.L.R.B. at 125–26.

We disagree. We first note that *Great Dane* primarily involved 29 U.S.C. § 158(a)(3), the federal counterpart to RSA 273-A:5, I(c), a provision not at issue in this appeal. Second, even if we assume that the analysis in *Great Dane* applies to 29 U.S.C. § 158(a) in general, and, therefore, by analogy to all of RSA 273-A:5, I (1987), the union fails to explain how the wage and benefit changes adversely affected employee organizing rights. On the contrary, on the record in this particular case, the proposed changes themselves prompted the organization process, and the record is devoid of any suggestion that the changes interfered with the fairness of the organization process. *See* RSA 275-A:5, I(b). Additionally, there was no material difference between the proposed changes and those actually implemented. Ironically, for purposes of RSA 273-A:5, I, the only consequence of the proposed changes was the birth of a bargaining unit. We cannot say that the changes bear their own indicia of intent.

The union next relies on *National Labor Relations Board v. Arrow Elastic Corp.*, 573 F.2d 702 (1st Cir. 1978), to support its argument that proof of discriminatory motive or intent is not required in this case because the timing of the changes was such that illegal intent may be inferred. In *Arrow*, the issue was the timing of benefits changes. The workers began organizing a union in early 1976, with an election scheduled for May 6, 1976. *Id.* at 703. On May 4, in speeches to two shifts of workers, the company president announced that a fixed pension plan would be added to the profit sharing program, that there would be a general wage increase

effective August 1, and that employees would receive an additional holiday. *Id.* at 704. The president said, "I spoke to the people because there was going to be a union election and I wanted to win it." *Id.*

The company argued that there was a general policy of wage increases around August 1 each year, that the pension program had been under consideration for some time and the decision to implement it was made without knowledge of union activity, and that the decision to grant the extra holiday was made without knowledge of union activity. *Id.* The company argued that the changes were "pre-determined" benefits and did not amount to an unfair labor· practice. *Id.* at 705.

The court held that the term "pre-determined" contemplates benefits or changes that are already existing, or to which employers have made a binding commitment regardless of the outcome of the election. *Id.* The court found that Arrow was not legally committed to the pension plan until later that year, that formal adoption of the plan was more than just a formality, and that Arrow was free to abandon the plan at any time. *Id.* Moreover, no specific provisions of the program had been announced prior to May 4. *Id.* Finally, the court found that even if the plan had been pre-determined, the labor board "could infer from the company's failure to reveal any of the details until election eve, that it was deliberately delaying the announcement in order to influence the election." *Id.* at 705–06.

The union argues that *Arrow* is directly on point. It argues that the county was not legally bound to the changes and that the county specifically decided to implement the plan during the union's formation period. The changes, however, were substantially decided on prior to knowledge of the petition, and their implementation was merely a matter of waiting for approval of the next budget. In addition, all the elements of the changes were explained in detail two months before the petition was filed. Finally, the union's own representative admitted that the union was being formed in response to the announced changes. We find it difficult to understand how a unionization effort and wage and benefit changes can at once be both causes and effects of each other. We also note that the changes in *Arrow* involved additional benefits calculated to woo the votes of the workers. *Id.* at 704. In contrast, the changes in this case were benefit reductions which had the effect of encouraging unionization.

We conclude that under the circumstances of this case, the union must prove some minimal degree of illegal motivation on the part of the employer to commit an unfair labor practice before the PELRB

can find that RSA 273-A:5, I(a) or (b) has been violated. Here, the exact opposite occurred; there was no evidence of illegal motivation, no interference with the rights of the employees, no adverse effect on the certification process, no inherently unfair conduct, and no suspect timing implying illegal intent. Accordingly, we reverse the decision of the PELRB.

*Reversed.*

BRODERICK, J., did not sit; the others concurred.