**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**STYLETEK, DIVISION OF PANDEL–BRADFORD, INC., Respondent.**

No. 75–1017.

United States Court of Appeals,
First Circuit.

Argued June 3, 1975.

Decided Aug. 6, 1975.

276

Margery E. Lieber, Atty., with whom Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and John H. Ferguson, Atty., were on brief, for petitioner.

George H. Foley, Boston, Mass., with whom Hale & Dorr, Boston, Mass., was on brief, for respondent.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

CAMPBELL, Circuit Judge.

This case arises out of an organizational campaign by Teamsters Local 437 at the Groveland, Massachusetts, plant of Styletek, Division of Pandel-Bradford, Inc. In an unfair labor practice proceeding after the union narrowly lost a representation election, the National Labor Relations Board found that the company violated section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1),[1] by promising and granting benefits in order to discourage unionization, and by coercively interrogating employees on one occasion. The Board now

---

1. Section 8(a) provides in part,

"It shall be an unfair labor practice for any employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 . . . ."

Section 7 provides,

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3)."

petitions for enforcement of its order,[2] and our task is to determine whether substantial evidence in the record as a whole supports the two Board findings of violations.

## I
## PROMISES AND GRANT OF BENEFITS

At the hearing before the administrative law judge, the following evidence was introduced. The company engages in the manufacture, sale, and distribution of unit soles, heels, and platforms for shoes. On May 29, 1972, general manager John Walker gave all employees a general cost-of-living increase and said there would be a similar increase in May 1973. From May 1972 through March 1973, the company expanded rapidly, increasing the number of its employees from about 50 to about 315. The company did not have a formal personnel department or an experienced personnel official, and records were not properly kept. Inequities arose in wage grade structures, hours per shift, and weekly schedules in the different departments. In February 1973, the company began moving piecemeal into a new plant.

In late February 1973, employee Cook first contacted the union and arranged a meeting between the union and six employees. Employees then began handing out union cards and literature and speaking about the union. By early March the company was aware of the union's organizing activities.

Near the end of April 1973, the company hired Michael Foster, a man experienced in reorganizations, as general manager. He was to plan and carry out a reorganization of production and administrative procedures. Foster was informed by his predecessor that the employees had been promised another cost-of-living increase in May 1973, but no increases were made at that time. During the spring and summer a number of employees individually and occasionally in groups asked Foster when they would get a raise. Foster's response was that the company was in the process of reviewing and rewriting all job descriptions for the plant and also working on incentive systems. Foster told the employees that the company was trying to do a complete revision rather than just a piecemeal job. In May, in order to expedite preparation of the job descriptions, Foster hired an industrial relations engineer, Ronald Coupe. On June 8, the company announced that certain areas of the unit sole department would change from a schedule of four 12-hour days per week to one of six eight-hour shifts, and that wages of the affected employees would be raised to compensate them for the accompanying loss of overtime pay. Also, an incentive plan for them was instituted shortly thereafter.

On June 29, the last day before the plant shut-down for a two-week summer vacation, Foster posted the following notice following employee pressure for a wage increase:

"The rapid growth of Styletek has tended to create some inequities in the labor grade and rate structure of some of the jobs at the Styletek factory. For this reason, we are presently reviewing all jobs with an eye toward correcting any inequities in these grades and broadening the wage categories.

You have seen the beginning of this effort with the realignment of the unit sole department along with the installation of the incentive system for this area.

2. The Board ordered the company to cease and desist in the unfair labor practices and to post appropriate notices, but did not order the company to revoke wage increases or other benefits promised or granted. The Board also ordered that the September 6, 1973, election be set aside and a new election held, but does not seek review of this directive because it is not a final order reviewable by this court under §§ 9(d), 10(e), & 10(f) of the Act. See e. g., NLRB v. Falk, 308 U.S. 453, 459, 60 S.Ct. 307, 84 L.Ed. 396 (1940); Hendrix Mfg. Co. v. NLRB, 321 F.2d 100, 106 (5th Cir. 1963).

We will continue to review all job descriptions, labor grades, and the possibility of incentive programs in as many areas as possible.

We hope this will eliminate any inequities that presently exist."

On July 24 the union filed a petition for an election. Beginning in early August, after job descriptions in the production department had been rewritten and the number of labor grades reduced, each employee was evaluated and slotted into a grade and position within the grade by supervisors and Foster. On August 15 a group of 15 to 20 women from the unit sole finishing area at the end of their shift presented Foster with a petition and orally argued for a cost-of-living wage increase. Foster asked them for their notes from which they were reading, and they typed these notes and presented them to Foster the next day, August 16. Foster told the women that a new job system was near completion, and that he hoped it would be in effect within a week.[3] Also, on August 16 the company and union signed a Stipulation For Certification Upon Consent Election, in which they agreed to an election on September 6.

On August 20, Foster posted the following notice:

"TO ALL FACTORY AND WAREHOUSE EMPLOYEES:

As we reported to you last June 29th, we have been reviewing all jobs with an eye to correcting inequities in our rate structure and broadening the wage categories. This has been a difficult and time consuming job because it has involved reviewing all job descriptions and labor grades and then slotting in each individual at the appropriate step and hourly rate in his or her labor grade.

As demonstrated by the copy of the new wage structure posted herewith, we have reduced the number of grades from seven to three and have substantially raised the maximum for each job.

The new structure sets minimum amounts which an employee must receive after 30 day's employment in a particular labor grade and again after an additional 90 days of employment in the grade. *No one will receive less than these minimums,* but he or she may receive more.

Raises after the 120 day increase will be based upon merit up to the maximum for each job.

Your supervisors will talk to each of you in the next day or two and furnish you with a copy of your job description, tell you your new rate of pay and answer any questions. The new rate will be reflected in your pay envelope this coming pay day.

We are continuing to review the possibility of incentive programs in as many areas as possible on a basis which would guarantee that no employee would receive less than he now receives but which would earn him additional money for greater productivity.

Michael Foster,
General Manager"
[emphasis in original]

This plan was implemented promptly. Each production employee was spoken to and furnished with a copy of his job description by the employee's supervisor. The supervisors did not talk about the union or pending election at that time. The job reevaluation covered all production employees, about 140 people. It did not include 25 to 30 maintenance and machine shop employees, who were also eligible to vote in the election. Under the plan no one (with one possible exception) received a wage decrease, some received no increase, and others received increases of varying size. The plan raised by about five percent the compa-

---

**3.** It is unclear from the record whether Foster made this statement in the August 15 or 16 meeting, thus either before or after the date of the consent election was agreed upon. Foster testified that he posted the notice of August 20 "some four to five days after that meeting" in which he made the statement.

ny's labor costs for production employees covered by the plan. Foster continued to work on further incentive programs and was still doing so at the time of the unfair labor practice hearing in January 1974.

In the secret ballot representation election on September 6, 1973, the union lost by a 90 to 78 vote, with 10 ballots challenged and remaining unopened.

The administrative law judge found that the timing and other circumstances of the company's promises and grants of benefits warranted the inference that the conduct " 'was designed to defuse the employees' union activity, particularly in the absence of evidence of any legitimate economic reason for the timing of the change' ". The judge further found that the company's " 'series of specially timed announcements . . . were designed to, and did, interfere materially with the organizational rights of its employees.' " She concluded that as the granting and announcement of benefits, and promises of future benefits, were to discourage unionization, the company had "interfered with, restrained, and coerced its employees" in the exercise of their section 7 rights, in violation of section 8(a)(1).

The Board, with Chairman Miller dissenting, affirmed the administrative law judge's findings and rulings. It took the position that the company had demonstrated anti-union animus by announcing and implementing a restructuring of its job classification and wage rates rather than by merely granting the earlier promised cost-of-living raise. The Board further noted that the August 20 announcement and grant of wage increases was timed "during the critical preelection period between July 24 (when the Union filed its petition) and September 6 (when the election was held)." Finally the Board rejected the company's argument of business justification, on the ground that the company's efforts to remedy wage inequities by hiring a new general manager did not occur until several months after union organizing efforts had begun.

In *NLRB v. Gotham Industries, Inc.*, 406 F.2d 1306, 1309 (1st Cir. 1969), we pointed out that there were two ingredients to a section 8(a)(1) violation case based upon an employer's granting of benefits to his employees. The Board must first prove that the employer knew or should have known, when he conferred the benefits, that a union was organizing or an election was pending. *Id.* at 1310. Second, it must appear, at least inferentially, that the benefits were granted with the purpose of interfering with the employee's choice to unionize. *Id.* at 1309. *See NLRB v. Exchange Parts Co.*, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). If they were granted primarily for a legitimate business purpose, they do not violate the Act.

In the present case, knowledge is not an issue: the company was aware that the union had begun to organize by the time it hired Foster, and of course it knew all about the September 6 election date when on August 20 it announced the wage increases.

■ The issue in this case is whether there is substantial evidence to support the Board's finding of intentional interference with the election, or whether, instead, the Board was bound to accept the company's evidence of an independent business purpose for all that was done. In treating this issue, the Board lumped together the company's hiring of Foster and his efforts to prepare a new wage and job plan with the August 20 timing of the actual implementation of the plan. All these elements, it felt, supported a finding of anti-union purpose. We do not agree. We think the company made out a persuasive case for a legitimate business purpose in the hiring of Foster, and in its activities and employee communications during the period prior to the filing of the election petition on July 24. None of these activities, in our view, support a finding of a section 8(a)(1) violation. However, we believe that the timing of the company's August 20 announcement of wage benefits, made two weeks before the election,

does support the Board's finding of a violation on that basis.

■■ We turn first to the bringing in of Foster in late April and his proposed revision of the entire wage and job structure, a prospect which was explained to the employees on June 29, 1973. Well before the union had come on the scene, the company had promised the employees a cost-of-living raise in May 1973. Thereafter the workforce grew sixfold within a year, a move took place, and confusion and dissatisfaction reigned. We cannot conceive of ruling that a company lacks the right to take steps to reorganize such chaotic conditions of employment. And along with the right to reorganize goes, naturally, the right to explain to employees what is going on and, here, why the earlier promised cost-of-living wage increase would not be granted. Merely by coming on the scene and starting to organize, a union cannot prevent management from taking reasonable steps to run its business properly.[4] See generally NLRB v. M. H. Brown Co., 441 F.2d 839, 849 (2d Cir. 1971). Quite plainly the wage plan in question had potential benefits for management as well as employees. It cut down the number of pay grades and permitted greater flexibility of assignment. Had the company merely been buying votes, it would scarcely have embarked upon such a complex reorganization. We think the company provided evidence of a business purpose sufficient to overcome any inference that its aim was principally to defeat the union. Given such substantial evidence of a legitimate business purpose, the burden shifted to the Board to show that the company's primary purpose was nonetheless anti-union. Gotham Industries, supra, 406 F.2d at 1309–11. This the Board conspicuously failed to do.

It may seem that matters should end here, since the August 20 announcement of actual implementation of the plan was arguably merely the culmination of what had been earlier foreshadowed. But we do not think so. While we hold that the company presented sufficient uncontradicted evidence of business purpose to avoid a finding of anti-union animus in the hiring of Foster and his development of the plan, we think it bore a separate and greater burden to explain why it announced the granting of the actual benefits only two weeks before the election. Both the Board and administrative law judge placed particular reliance upon the timing of the benefits. We think they were entitled to do so.

■ The Board has long required employers to justify the timing of benefits conferred while an election is actually pending. Justifying the timing is different from merely justifying the benefits generally. Wage increases and associated benefits may be well warranted for business reasons; still the Board is under no duty to permit them to be husbanded until right before an election and sprung on the employees in a manner calculated to influence the employees' choice. See, e. g., J. C. Penney Co., 160 N.L.R.B. No. 26 (1966), enf'd, 384 F.2d 479, 484–85 (10th Cir. 1967); Bryant Chucking Grinder Co., 160 N.L.R.B. 1526 (1966); Bergmann's Inc., 71 N.L.R.B. 1020 (1946). See also Perl, Granting of Benefits During a Representation Election: Validity of NLRB General Rule, 18 Lab. L.J. 643 (1967). Granting benefits during the pendency of a representation election has been treated as making out a prima facie case of intentional interference with employees' section 7 rights. See, e. g., N.C.V. Casino Corp., 174 N.L.R.B. 42 (1969); Browning Industries, Inc., 142 N.L.R.B. 1397 (1963). Even post-election benefits while there is the possibility of a rerun election have been regarded as prima facie interferences. See, e. g., NLRB v. Gruber's Super Mar-

---

4. This is an entirely different situation from one where a sluggish and apathetic employer is suddenly galvanized into action by the appearance on the scene of a union. See, e. g., American Nat'l Stores, Inc., 195 N.L.R.B. 127 (1972); United Foods, Inc., 170 N.L.R.B. 1489 (1968); Mossgrove Mining Co., 158 N.L.R.B. 1325, 1328 (1966).

*ket, Inc.,* 501 F.2d 697, 702–03 (7th Cir. 1974), enf'g ·201 N.L.R.B. No. 98 (1973); *Tringle Plastics,* 166 N.L.R.B. No. 86 (1967); *Ralph Printing & Lithographing Co.,* 158 N.L.R.B. 1353 (1966).

■ Here the benefits were conferred after the petition for election was filed and only several weeks before the election—and whatever the parameters of the sensitive pre- (and post-) election periods, this period is obviously well within them. *See NLRB v. Furnas Electric Co.,* 463 F.2d 665, 669 (7th Cir. 1972). The company was, of course, entitled to try to explain why the particular date was selected;[5] and the Board was entitled, if it chose, to believe the explanation. But when the event occurred within this critical period of time, the burden was very much on the company to satisfy the Board. It is obvious that the closer a wage benefit comes to the day of the election, the harder it will be for the union to answer, and the greater the danger that the benefit will be manipulated to sway the election. The Board is charged with the conduct of representation elections. We think it cannot be denied the right to protect the integrity of elections by attaching great (one might even say artificial) weight to timing within this period—even to the point of assuming *prima facie* that benefits conferred during this period were intended to interfere with employees' rights.[6]

It follows that the Board's decision must stand—even though the case, on the facts, is exceedingly close, and it is at least conceivable that we would agree with Chairman Miller's dissenting opinion were it our function, as it was his and his colleagues', to weigh the company's claim of justification. Our function, however, is only to determine whether the Board's findings are supported by substantial evidence; and where, as here, benefits are announced two weeks before an election we are disinclined, absent definitive facts pointing the other way, to upset the Board.

Here the company was unable to pinpoint a conclusive reason that justified this particular timetable—such as a past custom of August wage increases, or the necessity of approval at a board meeting at a predetermined date in August. *See, e. g., Gotham Industries, supra,* 406 F.2d at 1311; *NLRB v. Newman-Green, Inc.,* 401 F.2d 1, 3 (7th Cir. 1968); *Dakota Sand & Gravel Co.,* 211 N.L.R.B. No. 147 (1974); *Havatampa Cigar Corp.,* 175 N.L. R.B. 736 (1969). The company explained that it had completed its review and revisions of rates and job categories in August and thus the time had come to announce the revisions and the employees' new position. (Had it not done so before the election, indeed, it might have been the subject of adverse employee comment, having earlier promised such action.) Foster testified that other responsibilities had prevented him from completing the revisions earlier, and that the timing was coincidental, not designed to affect the election. Perhaps—but perhaps not. To be sure, as Chairman Miller points out, the company's explanation

---

5. The Board has often said that when economic circumstances call for wage changes and a representative election is pending, the employer should act as he would if the union were not on the scene. *See, ·e. g., The Great Atlantic & Pacific ·Tea Co.,* 166 N.L.R.B. No. 36 (1967). The advice, as this case demonstrates, is obviously perilous unless the employer can support with very specific facts the reason for granting benefits just then. A past history of annual wage adjustments on a particular date, or the like, would be an example of clear-cut factual support.

6. A union could mount a prolonged organizing campaign, obtain cards enough to petition for an election, and be defeated as the result of a skillfully timed last-minute wage adjustment which would seem either to obviate the need for a union or to be in jeopardy were the union to win. *See, e. g., Lincoln Mfg. Co. v. NLRB,* 382 F.2d 411, 414 (7th Cir.), cert. denied, 389 U.S. 972, 88 S.Ct. 470, 19 L.Ed.2d 463 (1967); *Crown ·Tar & Chemical Works, Inc.,* 365 F.2d 588, 590 (10th Cir. 1966), enf'g 154 N.L.R.B. No. 41; cf. *NLRB v. Delight Bakery, Inc.,* 353 F.2d 344, 345–46 (6th Cir. 1965). *See generally* Bok, *The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act,* 78 Harv. L.Rev. 38, 115 (1964).

was neither transparent nor implausible. The August date was generally consistent with the way matters had been handled. But the company, either innocently or deliberately, got itself into the bind. We think when an employer, without having some fairly rudimentary factual explanation for the timing, announces benefits after the petition for election is filed and two weeks before a representation election, it must take the chance that the Board will ascribe to it improper motives. Here Foster took over three months before announcing the actual details of the wage plan; the timing was within his grasp; and to the extent the Board misapprehends the motives, if indeed that be the case, the company must rightly bear the burden. *Compare Mr. Fine, Inc.*, 212 N.L.R.B. No. 49 (1974); *Dan Howard Mfg. Co.*, 158 N.L.R.B. 805 (1966), *with Indiana Metal Products, Inc.*, 100 N.L.R.B. 1040 (1952), enf'd, 202 F.2d 613, 620 (7th Cir. 1953); *Shelby Williams of Tennessee, Inc.*, 165 N.L.R.B. 737 (1967).

We affirm the Board's decision insofar as it found that the August 20 announcement interfered with the election of September 6, 1973.

## II

At the hearing two employees in the heel mold department gave the following testimony about an occurrence on about July 23, 1973, as the employees were completing their shift (from 11 p. m. to 7 a. m.). Several of the employees asked senior foreman Michael Holmes, who was supervisor for all three shifts in the department, if their shift could be changed from a Monday through Friday schedule to Sunday through Thursday. Holmes replied that if they took off the union buttons they were wearing he would see what he could do and there would be a bonus for them. Holmes grabbed at the buttons worn by two of

the employees and asked why the employees wanted a union. As the group was leaving, Holmes said he had their names in a little black book.

Holmes testified that he jokingly asked the employees why they did not remove "those silly union buttons," but denied that anything else was said or done on that occasion. The change in schedule was made on July 28, and Holmes and Foster testified that it was done for efficiency reasons.

The administrative law judge credited the testimony of the employees rather than that of Holmes. She found that, regardless of the reasons for the change in schedule, Holmes coercively interrogated the employees and promised them benefits to induce them to surrender their section 7 rights, in violation of section 8(a)(1). The Board adopted the findings of the administrative law judge.

The company does not claim that the Board erred in crediting the testimony of the employees rather than that of Holmes, but rather asserted that the incident was "too isolated and sporadic" to warrant a finding of any violation.

The incident lasted five minutes and involved only three to five employees, but this alone does not make it *de minimis* or not a violation of the act. *Cf. Teamsters Local 705 v. NLRB*, 509 F.2d 425, 427 (D.C. Cir. 1974); *NLRB v. Building Service Employees Local 254*, 359 F.2d 289, 291–92 (1st Cir. 1966). It must be viewed in context to determine whether it has the force of substantial evidence. Here the incident occurred during an organizing campaign and prior to a close election. Accepting the administrative law judge's findings, we think the interrogation was one which conveyed the impression that the employer would provide benefits if the union were opposed and would also consider reprisals against union supporters.[7]

7. Unlike the situation in *NLRB v. Garland*, 396 F.2d 707, 709 (1st Cir. 1968), which also involved isolated events, the encounter here was the sort which might be a conversation piece among employees. In *Garland* it was held that

the minor infractions, though not *de minimis* in themselves, were insufficient to constitute a repudiation of a thoroughly announced company policy of noninterference. That is not the situation here.

While the incident seems to have been of a limited nature, we cannot say there is not sufficient evidence to support the Board's finding of a violation of section 8(a)(1). Since the rerun of the election is in the offing, *see* part I and note 2 *supra,* Board intervention through a cease and desist order and a posting of notice may help maintain a neutral atmosphere.

*Enforcement granted.*