**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**STEINERFILM, INC., Respondent.**

**No. 81–1437.**

United States Court of Appeals,
First Circuit.

Argued Dec. 11, 1981.
Decided Feb. 5, 1982.

---

Steven M. Fetter, Washington, D. C., with whom William A. Lubbers, General Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and John G. Elligers, Washington, D. C., were on brief, for petitioner.

Joseph W. Ambash, Boston, Mass., with whom Jeffrey N. Barr, and Foley, Hoag & Eliot, Boston, Mass., were on brief, for respondent.

Before CAMPBELL and BOWNES, Circuit Judges, and WYZANSKI,* Senior District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

The National Labor Relations Board ("the Board") petitions this court for enforcement of its order issued April 9, 1981 against Steinerfilm, Inc. ("the Company"). The order requires the Company to cease and desist from certain practices which the Board[1] found to be in violation of the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. § 151 *et seq.*; to reinstate an employee whose discharge it found to be in violation of the Act and to expunge a written warning from his personnel file; and to post an appropriate notice. Upon review of the record, we conclude that, except for one unfair labor practice finding, the Board's decision is supported by substantial evidence, *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and we therefore, with the one exception, enforce its order.

I.

Steinerfilm manufactures dielectric tape. Two steps are required in the production process: first, aluminum is affixed to the tape; and second, the tape is cut to the desired width. Employees who perform the first step are known as "metallizers"; those who perform the second, "slitting operators." The Company moved to its present

---

* Of the District of Massachusetts, sitting by designation.

1. Except where otherwise noted, the Board affirmed the findings and conclusions of the administrative law judge who heard the case.

quarters in Williamstown, Massachusetts, in February 1978. Since that time, it has experienced rapid growth, with the number of employees increasing tenfold from eight or nine to almost 100.

Organizational activity began in the late summer of 1979. In mid-August, employee John LeFebvre informed the plant manager, Glenn Walters, that unionization was a possibility. Subsequently, LeFebvre and a fellow employee, James Mohl, contacted the union (District 2, International Union of Electrical, Radio & Machine Workers, AFL–CIO). The first meeting with a union representative was held on September 4, 1979, with about 30 employees in attendance. The Company was firmly opposed to unionization, a policy it made no attempt to hide. Over the next several months, it undertook activities, described below, which the Board found unlawfully interfered with the employees' rights to collective action. NLRA §§ 7, 8(a)(1); 29 U.S.C. §§ 157, 158(a)(1). The Company also discharged employee Michael Gazaille, a strong union supporter. The Board found that the discharge was motivated by the Company's anti-union animus and violated sections 8(a)(1), 8(a)(3), and 8(a)(4) of the Act, 29 U.S.C. §§ 158(a)(1), (3), (4). The Company responds that its actions were the result of legitimate business considerations; it also maintains that certain statements attributed to its management were not in fact made.

## II.

The Board found that the Company violated section 8(a)(1) of the Act[2] by threatening employees with plant closure, discharge, and other reprisals; by granting an unscheduled wage increase; by coercively interrogating employees about union activity; and by maintaining an overly broad no-solicitation rule, all for the purpose of discouraging employees from exercising their rights under section 7 of the Act.[3] Most of the issues raised on appeal turn, at bottom, on credibility determinations. While there was conflicting testimony concerning many of the challenged actions, we find that, with the exception of the wage increase issue, *infra*, the Board's credibility determinations were reasonable and that its decision rested on substantial evidence. *E.g., NLRB v. Pearl Bookbinding Co.*, 517 F.2d 1108, 1112 (1st Cir. 1975).

■ The first union meeting was held in the early evening of September 4, 1979. Employee Gazaille testified that when he returned to work from this meeting, which he had attended on his supper break, plant manager Walters approached him and told him that if it was faced with unionization, the Company would shut down and move elsewhere. Walters denied having said this. We think the Board could credit Gazaille's version of the conversation. We cannot say that it was so inherently implausible, as the Company suggests, that a reasonable factfinder could not credit it. The Board could properly find such a remark to be an unfair labor practice in the circumstances, *e.g., NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618–20, 89 S.Ct. 1918, 1942–43, 23 L.Ed.2d 547 (1975).

■ We also sustain the Board's decision that the Company violated section 8(a)(1) on September 5 (the day after the first union meeting) by interrogating employees LeFebvre and Gazaille about their union activity and threatening reprisals for it, and on January 29, 1980, by interrogating employee Paul Walsh about whether he had filed an unfair labor practice charge. LeFebvre testified that plant manager Walters questioned him as to why he was involved with the union, and threatened to "get rid of"

---

**2.** Section 8(a)(1) reads,
It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by section [7 of the Act].

**3.** Section 7 of the Act reads,

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. . . .

any union "instigators." Walters denied this, and the Company argues that Le-Febvre should not have been credited because of his obvious pro-union bias and hostility toward the Company. We have examined the record and uphold the credibility decision as being within the bounds of reason. As for Gazaille, he testified that on September 5, he met, separately from Le-Febvre, with plant manager Walters and Gordon Walters, president of the Company (and father of Glenn Walters). He stated that they questioned him as to whether he was a "spokesman" for "the third party" and told him that if he was, he "would pay." The two Walters deny this. A neutral witness to the conversation, employee James Crawford, also testified that Gazaille was asked about his role as a "spokesman." Crawford's testimony does not corroborate Gazaille's on all points; nevertheless the Board's decision to credit Gazaille over the two Walters is not unreasonable and must be sustained. Employee Walsh testified that plant manager Walters called him at his home late one night, inquired about his filing of an unfair labor practice charge, and then said he should have fired Walsh for drinking back in December. Again, the Board's decision to credit this testimony is supportable. Especially in the context of the Company's other anti-union activity, the Board was entitled to find that these inter-rogations had sufficient coercive impact to violate section 8(a)(1), and we therefore do not disturb the Board's decision. *See NLRB v. Amber Delivery Service, Inc.*, 651 F.2d 57, 67 (1st Cir. 1981).

The Board[4] also found that the Company violated section 8(a)(1) by twice suggesting to Gazaille that if he did not like the conditions at Steinerfilm, he could leave. While such statements may often be innocuous, we think the Board was entitled to infer, given the surrounding circumstances, that they constituted covert threats of discharge and suggestions that the Company would not tolerate Gazaille's collective activity. As such, they were coercive and supportably found to violate the Act. *See NLRB v. Crystal Tire Co.*, 410 F.2d 916, 918 (8th Cir. 1969).

The Company granted an unscheduled wage increase on September 5, the day after the first union meeting. The Board[5] found that this violated section 8(a)(1). The administrative law judge (ALJ), however, in finding that the wage increase was not an unfair labor practice, credited plant manager Walters, who testified that it had been under active consideration for at least a month prior to its announcement. The ALJ carefully weighed the conflicting testimony, and we do not think the Board was justified in reversing his credibility determination. Such wage increases were not unprecedented: this was the third within the last 18 months. It was distributed along with a new employee handbook, which had been in preparation for several months (unlike the Board we do not think it significant that the increase was on a separate piece of paper, as the handbook was designed to include permanent information, while the wage rates were subject to periodic change). While the timing[6] of the increase does render it

---

**4.** The Board reversed the ALJ's conclusion on this point. The Board's decision here, however, does not reflect a disagreement as to the credibility determinations of the ALJ, but only as to the drawing of inferences and legal conclusions from the facts. We therefore need not employ a degree of scrutiny significantly more stringent than that used when the Board upholds the ALJ. *See NLRB v. Matouk Industries, Inc.*, 582 F.2d 125, 128 (1st Cir. 1978).

**5.** The Board reversed the ALJ on this point; because it disagreed with the credibility determinations of the ALJ, we shall more carefully scrutinize its decision. *Compare* footnote 4, *supra.*

**6.** The Board considered the timing evidence of unlawful motivation but did not, in its decision, assert that the timing alone rendered the wage increase a violation, if it was lawfully motivated. To the extent that the Board does now make that argument, we are unpersuaded by it: the case it cites as support, *NLRB v. Styletek, Division of Pandel-Bradford, Inc.*, 520 F.2d 275 (1st Cir. 1975), involved the grant of benefits during the "sensitive" period when a representation election is pending. *Id.*, at 281. While the precise parameters of this period may not be certain, we think that one day after the first

suspect, the ALJ took this into account and nonetheless chose to credit Walters. The credited testimony establishes a lawful motivation for the wage increase, *compare NLRB v. Rich's of Plymouth, Inc.*, 578 F.2d 880, 884 (1st Cir. 1978), and we therefore set aside that part of the Board's order finding that the wage increase violated section 8(a)(1) and ordering the Company to cease and desist from such conduct (that part of the notice, which the Board ordered posted, relating to the wage increase must also be deleted).

■ Lastly, the Board found that the Company maintained an overly broad written rule prohibiting solicitation of union membership and distribution of union literature on company premises, in violation of section 8(a)(1). The rule, which was included in the employee handbook distributed September 5, prohibited "[s]olicitation or distribution on Company property without permission...." Such a broad rule is clearly an unfair labor practice. *See Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). The Company argues that it contained a typographical error omitting language that would have restricted its prohibition to working time only and that it was never enforced as written. Be that as it may, the very existence of such an overly broad rule can have a chilling effect, and the Board was therefore justified in ordering the Company to cease and desist from maintaining it and to include in the posted notice the statement that the rule will not be enforced. *Utrad Corp. v. NLRB*, 454 F.2d 520, 523–24 (7th Cir. 1971).

### III.

■ We turn now to the most important dispute between the parties, which concerns whether the Board was justified in concluding that the Company discharged employee Gazaille because of his union and other protected activity, in violation of sections 8(a)(1), 8(a)(3),[7] and 8(a)(4)[8] of the NLRA. The Company argues that it had a legitimate business reason for discharging Gazaille, namely, that he had threatened and was insubordinate to plant manager Walters. The Board concluded that this alleged reason was merely a pretext; we find substantial evidence in the record to support this conclusion and therefore enforce the Board's order requiring the Company to offer Gazaille reinstatement with back pay and without loss of seniority.

Before discussing the evidence, we first reject the Company's argument that the case should be remanded for reconsideration in light of this court's recent decision in *NLRB v. Wright Line*, 662 F.2d 899 (1st Cir. 1981). *Wright Line* clarified the precise allocation of the burden of proof in "mixed motive" cases where both anti-union animus and legitimate business reasons exist for a discharge. But the instant case, like another recent case of this court, was not decided "upon the niceties of burdens of proof. Rather, . . . the ALJ [and the Board] found evidence of anti-union motive and then went on to find that the employer's allegedly legitimate reason for the discharge was a pretext." *NLRB v. Magnesium Casting Co.*, 668 F.2d 13, 16 (1st Cir. 1981). In such

union meeting, in the absence of the filing of an election petition, does not come within its compass.

7. Section 8(a)(3) reads,

It shall be an unfair labor practice for an employer—

\* \* \* \* \* \*

(3) by discrimination in regard to hire or tenure of employment to encourage or discourage membership in any labor organization....

It is undisputed that Gazaille engaged in protected activity and that this was known by the Company at the time of the discharge.

8. Section 8(a)(4) reads,

It shall be an unfair labor practice for an employer—

\* \* \* \* \* \*

(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter.

The union filed an unfair labor practice charge on September 6, 1979, alleging that the discussions held with an employee (known by the Company to be Gazaille) on September 4 and 5 violated the Act.

circumstances, no remand is necessary. *Id.; Wright Line*, 662 F.2d at 907 n.13.

After the series of unfair labor practices discussed above, including threats to Gazaille, the Company issued Gazaille a formal written warning on November 20, 1979. This was the first such formal warning ever issued by the Company. It reads as follows:

> This notice is to inform you that despite repeated verbal warnings regarding your job performance over the last six months, the situation has not improved adequately. These verbal warnings have included poor output, unacceptable on time performance, insubordination, misrepresenting your work hours, abuse of the coffee breaks, unacceptable absenteeism and unattentiveness [sic] regarding your job responsibilities.
>
> We regret that this final warning must be handled in written form but repeated verbal warnings have gone unheeded. Please understand that any further violations of company policies will mean immediate discharge.

The Board found that the warning itself was unjustified and violated the Act and therefore ordered it expunged from Gazaille's file. We think the Board was fully justified in reaching its conclusion. The verbal warnings referred to were for the most part unsubstantiated. More importantly, the asserted reasons given by the Company do not stand up to scrutiny. The most important, "poor output," is belied by the record. The Company claims that production records show that another employee's output on the slitting machines was up to 69.5 percent greater than Gazaille's. But evidence in the record demonstrates that when the comparison is made solely on days when they were running the same machine—which the Company admits is the only valid comparison—the difference is reduced to 8.3 percent, and even that is largely the product of a day when Gazaille worked only five hours on the slitting machine, rather than the usual eight. Evidence of the other deficiencies is also suspect and in many cases refers to minor failings that Gazaille shared with many other employees who were not similarly warned. The Board concluded that the written warning was based on fabrications intended to provide a defense to an anticipated unfair labor practice charge should Gazaille be discharged. That finding has substantial record support, and we therefore uphold the Board's conclusion that this warning was an unfair labor practice and its order expunging it from his file.

Gazaille's receipt of this warning led to the series of events that culminated in his discharge. He received the warning from president Walters, in his office. Gazaille testified that it upset him; he told president Walters that it was a bunch of lies, then left the office and returned to his work station. About 15 minutes later, plant manager Walters walked into the area where Gazaille was working. Gazaille told him that he did not like to be threatened; Walters responded that it was not a threat and then a rather heated discussion ensued (Walters himself was unsure whether it was properly characterized as a discussion or an argument). Gazaille offered to "settle" things with Walters "out in the cornfield"; Walters, who is eight inches taller than Gazaille, refused. Gazaille challenged Walters to a race on the slitting machine, which Walters also refused. Gazaille at one point had a razor blade in his hand, which he used at his work, but there is no evidence that he made any threatening gestures toward Walters with it. He also apparently slapped his fist into his palm, in the course of what he said was cracking his knuckles. The employees who witnessed this did not construe it as either an attempt to hit Walters, or as a threat to do so. Rather, it apparently was simply a manifestation of Gazaille's emotional state. Gazaille also used some offensive and abusive language during the course of the confrontation. Other employees attempted to get Walters away by telling him that he had a phone call. He at first refused to leave but ultimately did so about 30 minutes, perhaps less, after the discussion began.

On November 27, Gazaille was discharged. He was told that the reason for the discharge was his conduct on November 20, in particular (but apparently not limited to) an alleged "physical threat" he made to plant manager Walters during their confrontation. The Board found that no physical threat had been made. We think this is a permissible finding on the record. A closer question arises whether Gazaille's utterance of insubordinate or abusive language provided conduct sufficient to support the discharge. We think the Board could reasonably conclude that the insubordination was an excusable, if a regrettable and undesirable, reaction to the unjustified warning Gazaille had received just minutes before, and that the discharge was therefore improper. *See Trustees of Boston University v. NLRB*, 548 F.2d 391, 392–93 (1st Cir. 1977).[9] The *Boston University* case sets out the principles against which a situation of this sort is to be gauged. We need not repeat what was said in that case. It is enough to note that the Board's judgment here comes within permissible limits as set forth there. Other circuits have similarly recognized that, in a proper case, the Board may order reinstatement of an employee whose rudeness and "excessive expression" were the result of unjustified treatment by the employer, *NLRB v. M&B Headwear Co.*, 349 F.2d 170, 174 (4th Cir. 1965), and of employees who used profane language in presenting grievances, *Crown Central Petroleum Corp. v. NLRB*, 430 F.2d 724 (5th Cir. 1970); *NLRB v. Thor Power Tool Co.*, 351 F.2d 584 (7th Cir. 1965); *Hugh H. Wilson Co. v. NLRB*, 414 F.2d 1345, 1355–56 (3d Cir. 1969), *cert. denied*, 397 U.S. 935, 90 S.Ct. 943, 25 L.Ed.2d 115 (1970). We cannot say that the Board exceeded the bounds of its permissible discretion in finding Gazaille's discharge an unfair labor practice and ordering his reinstatement,[10] and we therefore uphold its order. This is not to say that there are no limits to employee insubordination, even when provoked; we merely say that on these facts and this record, we believe the Board has not overstepped the limits of what is permissible.

With the exception of that part of the Board's order relating to the granting of a wage increase, as noted *supra*, the Board's order is enforced.

*So ordered.*

---

9. We are at a loss to understand why this case, the authority in the circuit most pertinent to this point, was not cited by counsel for either party.

10. The Board was also justified in concluding that reinstatement was the proper remedy. Construing the evidence in the light most favorable to the Board, Gazaille's conduct was not so outrageous that he forfeited his claim to his job, nor so egregious that the Board could not reasonably conclude that reinstatement would further the policies of the Act. *See generally Boston University, supra*, 548 F.2d at 393–94.