**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**STATE PLATING & FINISHING COMPANY, Respondent.**

**No. 83–5058.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 21, 1984.

Decided July 3, 1984.

Elliott Moore, Deputy Associate Gen. Counsel, Ellen Farrell (argued), N.L.R.B., Washington, D.C., for petitioner.

Peter J. Kok (argued), Grand Rapids, Mich., for respondent.

Before KENNEDY and WELLFORD, Circuit Judges, and COOK, District Judge.*

CORNELIA G. KENNEDY, Circuit Judge.

The National Labor Relations Board ("NLRB" or "Board") seeks enforcement of its order directing State Plating & Finishing Company ("State Plating") to bargain with Local 406 of the Teamsters Union.[1] State Plating has refused to bargain in order to contest the election which resulted in certification of the union. State Plating contends that the election must be set aside because during the election campaign a union representative and a NLRB agent falsely led the employees to believe that their employer had lied to them about its inability to grant raises before the election. We agree with the employer that the NLRB agent's statements compromised the Board's neutrality and deny enforcement.

## I

On September 16, 1980, the union filed a petition for a representation election with the NLRB, and an election was scheduled for November 14, 1980. After the election had been scheduled William Waring, the vice-president of State Plating, was asked by certain employees why they were not receiving raises. Waring replied that under the NLRB's rule he could not give out any raises from the time the union demanded recognition until the election, because if he did it would appear as though he were trying to influence votes. Waring gave this response to several individual employees and groups of employees. In fact

State Plating had not announced nor had it scheduled or decided upon any pay raises before the union's petition for certification was filed. It was the company's practice to give individual employees five-cent, ten-cent, fifteen-cent, or twenty-cent an hour raises at various times. Sometimes an employee would receive raises in successive months. The company had given all its employees a ten-cent an hour raise in February 1980. A number of employees had received individual raises after that date; two of them in August shortly before the petition was filed. All employees had been given some wage increase in the fall of 1979. Some received a ten-cent increase in September and another ten cents in October. One received fifteen cents in September and twenty cents in October. One received ten cents in September and ten cents in November. Others received only one increase of five cents, ten cents, or fifteen cents in October. Most, but not all, employees had received some raise at various dates and in varying amounts in the fall of 1978.

The employees brought their concern over the moratorium on raises to union business agent John Winkle. Winkle told the employees that the union had no objection to regularly scheduled pay raises and that the employer could give them if it wanted to. The employees expressed a desire to verify that their employer could indeed grant raises by obtaining an opinion from the NLRB.

Four days before the election, twelve employees met at Winkle's office.[2] Winkle placed a call to the NLRB on his speaker phone and reached a NLRB field examiner, Joan Wesa. Wesa had no connection with the State Plating case, but had dealt with Winkle regarding another case. Wesa testified that Winkle told her that some em-

* Honorable Julian A. Cook, Jr., United States District Court for the Eastern District of Michigan, sitting by designation.

1. The Board's decision is reported at 262 N.L.R.B. No. 16, 110 L.R.R.M. 1264 (1982).

2. Three days earlier Winkle had given the NLRB's phone number to Christine Jones, an employee, so that the NLRB could answer her questions and those of other employees. Jones lost the phone number. When Winkle learned that the employees contemplated calling from Jones' home, he offered them the use of the union office and its speaker phone for the call.

ployees had some questions regarding a scheduled election, and that an employee then began asking questions. The employee, Christine Jones, first asked Wesa whether the NLRB was in alliance with the union. Wesa replied that the NLRB was impartial.

Jones then asked Wesa whether her employer could continue giving regularly scheduled raises despite a pending election. No witness was able to relate the exact language used by Wesa in reply. Wesa testified that she told the employees that she didn't like to give such information over the telephone, but that "it was possible for an employer to give a pay raise even though an election is coming." Transcript at 91. Wesa's handwritten notes made during the conversation indicate that her answer was "normally yes—that if they're already due—they should receive them as if there were no election coming." A number of employees testified Wesa had said that they could receive "regular" raises. Wesa was not told and did not ask about State Plating's prior history of granting wage increases or whether any raises had been announced or actually scheduled by the employer.

The conversation with Wesa was widely discussed among all the employees and led many of them to believe that Waring had lied to them about his ability to grant raises. The employees confronted Waring with their belief that he had lied, and would not listen to Waring's attempts to explain his position. The NLRB rejected Waring's request that it further clarify the law regarding wage increases. The union won the election by a vote of sixteen to eleven.

State Plating filed objections to the election, and a hearing on the objections was held before a NLRB Hearing Officer. The Hearing Officer recommended that the objections be overruled. The NLRB adopted the Hearing Officer's report and recommendations, and certified the union. State Plating refused to bargain with the union, and the NLRB now petitions for enforcement of its order requiring State Plating to bargain.

State Plating argues that the certification was improper for three reasons: (1) Wesa's misleading statement regarding a local issue destroyed NLRB neutrality; (2) Winkle abused NLRB processes by implying that the NLRB supported the union's claim that Waring was lying; and (3) Winkle's assertion that State Plating could not give out raises constituted a material misrepresentation. We need reach only the first of these arguments.

The NLRB in its certification order adopted the Hearing Officer's findings, which thus are the findings of the NLRB. The Hearing Officer found that the effect of Wesa's conversation with the employees on the election should be evaluated according to the following standard: "The agent's agreement to answer a question or the actual answer given must neither compromise Board neutrality nor constitute a material misrepresentation of law within the standard of *General Knit* ... or the agent's conduct may be deemed objectionable interference with a NLRB election." The Hearing Officer further found that the issue of the NLRB's neutrality depended on whether Wesa's "response to a question concerning employee pay increases ... indicated support of any particular party." The Hearing Officer concluded that it did not, because: "Wesa was confronted with a general question, to which the record indicates she gave a general statement of law, not wedded to any factual position." The Hearing Officer also found that Wesa's response was an accurate general statement of the law and not a material misrepresentation.

Resolution of this case depends on whether these findings are supportable under the applicable standard of review.

## II

29 U.S.C. § 160(e) provides: "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." *See also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (substantial evi-

dence test applied to review of NLRB action; standard of review same as under Administrative Procedure Act). The NLRB, however, argues that the substantial evidence test is not the appropriate standard of review in this case. While admitting that factual findings are reviewable under the substantial evidence test, the NLRB argues that the application of its rules to particular facts is the means through which the Board concretely defines the limits of its election policies. The NLRB argues that application of election rules to particular facts therefore should always be reviewed on the basis of whether the Board's election policy, as thus defined, constitutes an abuse of the Board's broad discretion in conducting elections and resolving representation matters. *See NLRB v. A.J. Tower Co.*, 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 322 (1946); *NLRB v. Wackenhut Corp.*, 471 F.2d 761 (6th Cir.1972).

This argument was recently rejected by the Seventh Circuit, sitting en banc, in *Mosey Manufacturing Co. v. NLRB*, 701 F.2d 610 (7th Cir.1983). In *Mosey*, the court held that "the proper standard of judicial review in cases involving the [NLRB's] application of its election rules to particular facts" was substantial evidence on the record as a whole. 701 F.2d at 611, 615. In rejecting the abuse of discretion standard, the court emphasized "the difference between discretion in formulating rules and discretion in applying them to facts," 701 F.2d at 615, and held that:

> the abuse of discretion standard ... is meant for the review of decisions that have one or more of the following characteristics: the factors that are supposed to dominate the decision cannot be evaluated by the reviewing court; the decision is supposed to be made on the basis of subjective rather than objective factors—the individual judgment of the judge or administrator, rather than some articulable legal standard; uniformity of decisions is not important.

701 F.2d at 615. The same conclusion was reached by the Third Circuit in *Jamesway Corp. v. NLRB*, 676 F.2d 63 (3d Cir.1982). The *Jamesway* court held that:

> there is no indication that the court [in *NLRB v. A.J. Tower*, 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 322 (1946)] intended to displace the substantial evidence standard of review which under 29 U.S.C. § 160(e) & (f) is to be applied by courts of appeals to the Board's findings of fact. Thus, *A.J. Tower Co.* accords the NLRB wide discretion in formulating election procedures; it does not thereby limit court of appeals review of Board determinations concerning election conduct to the more restrictive abuse of discretion standard.

676 F.2d at 67.

We agree with these decisions at least to the extent that in deciding which standard to apply they look to whether the Board action under review represents the establishment or refinement of a rule governing elections, or whether it is the application of a rule to particular facts. Exercise by the Board of its rulemaking discretion to establish "the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees," *A.J. Tower Co.*, 329 U.S. at 330, 67 S.Ct. at 327, normally involves evaluation by the Board of various subjective policy concerns. Review under a substantial evidence standard of the application of a rule to particular facts, which does not involve evaluation of policy concerns, will not subject courts to "the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy," *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941).

The NLRB findings under review in the present case cannot be characterized as establishing and refining rules governing representation elections. The Board's finding (through its Hearing Officer) that the Board's neutrality was not impaired by NLRB agent Wesa's conversation with the employees is based on its finding that Wesa merely gave a general statement of law in response to a general question, and did not comment on a local issue. In mak-

ing this finding, the NLRB did not weigh policy considerations and conclude that the election should not be set aside despite the agent's comment regarding a local issue. Instead, the Hearing Officer's report can be fairly read as implying that the election would have been set aside if the agent's answers had been more than a general statement in response to a general question. No other rule may be gleaned from the Hearing Officer's report, which was adopted by the NLRB.

Similarly, the Board's finding that agent Wesa did not misrepresent the law does not establish or refine any election rule. The Hearing Officer's report stated that "when the Board in a pre-election context materially misstates the underlying law ... its conduct may be deemed objectionable." It is only whether this rule has been violated, not the rule itself, that is challenged in the present case. The Board's conclusion that Wesa had not materially misrepresented the law did not derive from the Board's judgment that, although a misrepresentation was made, it was not of sufficient import to warrant setting aside the election.[3] Instead, the Board rested its conclusion on two findings, neither of which required it to exercise its discretion: (1) that Wesa had given a general statement of the law and not a comment on a local issue; and (2) that Wesa's comments were "in fact an accurate representation of Board law."

■ The abuse of discretion standard is therefore not appropriate for review of the Board's findings here concerning impairment of Board neutrality and Wesa's alleged misrepresentation of law.[4]

We thus turn to the question of whether the Board's findings are supported by substantial evidence on the record considered as a whole.

### III

State Plating asserts that the election was unfair because the NLRB destroyed its neutrality by giving the employees an opinion on a local issue that was important to the election's outcome. We agree.

■ It is well-settled NLRB law that Board agent conduct that tends to impair the Board's neutrality is sufficient ground for setting aside an election. This principle was espoused by the Board in *Athbro Precision Engineering Corp.*, 166 N.L.R.B. No. 116, 65 L.R.R.M. 1699, 1699 (1967), *vacated on other grounds*, 67 L.R.R.M. 2361 (D.D.C.), *acq.* 171 N.L.R.B. No. 4, 68 L.R.R.M. 1001 (1968), *enforced*, 423 F.2d 573 (1st Cir.1970), where it said:

The Board in conducting representation elections must maintain and protect the integrity and neutrality of its procedures. The commission of an act by a Board Agent conducting an election which tends to destroy confidence in the Board's election process, or which could reasonably be interpreted as impugning the election standards we seek to maintain, is a sufficient basis for setting aside that election.

---

**3.** *Midland National Life Ins. Co.*, 263 N.L.R.B. No. 24, 110 L.R.R.M. 1489 (1982), where the Board most recently changed its standards for determining when campaign misrepresentations warrant setting aside an election, is an example of a case where the Board did make such a policy judgment. Review of the validity of those standards would be subject to the abuse of discretion standard. *See Van Dorn Plastic Machinery Co. v. NLRB*, 736 F.2d 343 (6th Cir. 1984).

**4.** Application of the substantial evidence test to a finding concerning the Board agent's misrepresentation is not inconsistent with cases in this Circuit concerning misrepresentations by parties in election campaigns. In *Harlan # 4 Coal Co. v. NLRB*, 490 F.2d 117 (6th Cir.), *cert. de-

*nied*, 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974), this Court reviewed the Board's finding that a union had not made material misrepresentations on a substantial evidence standard. In *NLRB v. Holland American Wafer Co.*, 683 F.2d 135 (6th Cir.1982), this Court used an abuse of discretion standard, but only to evaluate the test used by the Board to measure the substantiality of misrepresentations. And in *NLRB v. Pinkerton's, Inc.*, 621 F.2d 1322 (6th Cir.1980), and *NLRB v. Dean Foods Co.*, 421 F.2d 664 (6th Cir.), *cert. denied*, 398 U.S. 939, 90 S.Ct. 1843, 26 L.Ed.2d 271 (1970), this Court framed the issue in terms of whether the Board abused its discretion, but actually evaluated specific findings under a substantial evidence standard.

■ One form of conduct that so impairs the appearance of Board neutrality is when a Board representative comments on a local issue in a campaign before the election. In *Monmouth Medical Center*, 234 N.L.R.B. No. 50, 97 L.R.R.M. 1350, 1353–54 (1978), the Board recognized that "the Board, in order to retain its neutrality, must refuse to answer a question regarding local issues in a campaign."

■ The Board found that agent Wesa had not answered a question regarding local issues in a campaign because "Wesa was confronted with a general question, to which the record indicates she gave a general statement of law, not wedded to any factual pattern or party's position." This finding is not supported by the record.

Whether State Plating could give its employees raises during the campaign was certainly a local issue during the election campaign. State Plating, through Waring, claimed that it could not give raises, while the union contended it could. The employees who met at the union office to call the NLRB were seeking resolution of a specific issue of concern to them: Was Waring lying when he said he could not give them any raises?

That the employees were asking questions in regard to their own specific situation is clearly illustrated by undisputed testimony. For example, employee Banks testified, "We wanted to find out if Bill [Waring] was correct in what he said about giving raises out," Transcript at 51; employee Christine Jones testified, "I asked her [Wesa] if we were getting a regularly scheduled set of raises if Bill [Waring] could still give them," Transcript at 113; and union agent Winkle testified, "One question [Jones] asked was Bill [Waring] entitled to give regularly scheduled raises even if the union was mixed up in it," Transcript at 150. The consistent references to their employer's name indicates that the employees were concerned with their specific situation. That the employees

were asking a specific question was partly recognized by the Board when it found that "it is established that 12 employees gathered at [the union] hall to seek answers to two questions: ... (2) whether the Employer could legally grant them wage increases or whether it was unable to grant pay raises, as Waring had represented to them." The employees were not asking for a general statement of the law.

The effect of Wesa's comments may not be avoided by arguing that despite being asked a specific question, she responded with a general statement of law. The effect her comments had on the election must be examined from the employees' point of view. Wesa should have realized that the employees were concerned with a specific issue and would take her statement as a specific answer to their concern.[5] Employees would not be expected to ask for a general statement of law when their concern was with whether *they* could be given *their* raises. The employees were not likely to realize that the words "regularly scheduled" were a term of art, or that whether the raises were "regularly scheduled" was a crucial issue. They would expect Wesa to inquire about the raises' regularity, if the answer turned on that information.

Even if Wesa could not have realized that the employees would misinterpret her statement, the fact remains that they did interpret it as applying to raises they hoped for or expected and their misinterpretation tainted the election. The uncontradicted testimony is that Wesa's comments led the employees to believe that Waring had lied to them. For example, employee Moore testified as follows:

Q: It is my understanding of your testimony that you understood from Miss Wesa that Mr. Waring could give you that money if he wanted to?
A: Yes.

Transcript at 130. The raise Moore believed she had been denied was based on

---

5. Whether Wesa should have realized she was asked a specific question is unimportant. Impairment of Board neutrality is dependent on

the employee's perception of the Board agent's comments, not on who is to blame for that perception.

her understanding that her work record would be reviewed periodically and she would get increases if she were entitled to them. No fixed periods for review were set. Moore also testified that she told other employees and Waring himself that Wesa had made Waring look like a liar. Waring testified that several employees accused him of lying.

■ The appearance of a compromise of Board neutrality will warrant setting aside an election even if the Board in fact remains neutral. In *Provincial House, Inc. v. NLRB*, 568 F.2d 8 (6th Cir.1977), a NLRB agent had interviewed witnesses for an unfair labor practice investigation in one part of a meeting room while the union agent conducted discussions of the possible unfair labor practice in another part of the room. This Court found that "the Board representative, whether inadvertently or not, allowed himself to be used in a manner which seriously affected the neutrality of the Board's procedures," 568 F.2d at 11, and ordered the election set aside. In *Mercury Industries, Inc.*, 238 N.L.R.B. No. 124, 99 L.R.R.M. 1391, 1391 (1978), the Board said that its "concern is not with the substance of partisan additions made to an Agency document, but with the possible impact such an adjunct might have upon the freedom of choice of a voter."

■ The undisputed evidence in this case is that the employees considered the NLRB to have endorsed, four days before the election, the union's position on a local issue of great concern to them. The Board's finding that its neutrality was not impaired by a comment on a local issue is therefore not supported by substantial evidence.

### IV

The Board found that Wesa's "statement of the law regarding pre-election wage increases does not constitute a material misrepresentation, but is in fact an accurate representation of Board law." The Board thus found that the election was proper because: "It is only when the Board in a pre-election context materially misstates the underlying law or interferes with the

election process by imposing a legal conclusion upon a specific factual pattern that its conduct may be deemed objectionable."

We have concluded that Wesa's comments had the effect of imposing a legal conclusion on a specific factual pattern. As the Board found that Wesa had given only a general statement of the law, it did not directly decide whether the specific conclusion that Waring could have lawfully awarded raises constituted a material misrepresentation. Before this Court, however, the NLRB contends that the employees were not misled by Wesa's statements because their conclusion that Waring could grant raises was correct. We disagree.

■ Granting benefits to employees before an election constitutes an unfair labor practice if motivated by a desire to induce votes against a union. No conditions or threats need be attached to the benefits to establish such motivation. *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). If raises are granted after the election petition is filed and before the election, the NLRB presumes the employer acted with an illegal motive. *See, e.g., NLRB v. Anchorage Times Publishing Co.*, 637 F.2d 1359 (9th Cir.), *cert. denied,* 454 U.S. 835, 102 S.Ct. 137, 70 L.Ed.2d 115 (1981); *NLRB v. Rich's, Inc.*, 578 F.2d 880 (1st Cir.1978); *NLRB v. Styletek, Division of Pandel-Bradford, Inc.*, 520 F.2d 275 (1st Cir.1975); *Baltimore Catering Co.*, 148 N.L.R.B. No. 101, 57 L.R.R.M. 1106 (1964). "The burden then shifts to the employer to justify both the fact and the timing of the increase." *Rich's,* 578 F.2d at 884.

Whether Waring was correct in saying he could not give out raises during the pre-election period therefore depends on whether the presumption of illegal motive could have been rebutted. A brief review of a few cases in which employers have attempted to rebut this presumtion will aid our analysis.

In *Ken McKenzie's, Inc.*, 221 N.L.R.B. No. 108, 90 L.R.R.M. 1545 (1975), the employer had an established policy of grant-

ing raises to its store employees in December of each year. In October 1973, a new store was opened. The employees at that store did not receive raises two months later, in December 1973. They did receive raises in December 1974, one month before a union election was scheduled. The Board found that the raises unlawfully interfered with the election, terming the wage increases "unscheduled" since the employer had not previously announced that its policy would extend to the new store.

In *Baltimore Catering Co.*, 148 N.L.R.B. No. 101, 57 L.R.R.M. 1106 (1964), the employer announced wage increases the day after the union mailed an election petition. Five months earlier, the employer had begun to seek permission to raise its prices in order to pay for a wage increase. The Board found that this was insufficient to rebut the presumption since it did not justify the timing of the raises, and said: "The fact that the employees may have known about or otherwise anticipated the increase in wages is not necessarily controlling." 57 L.R.R.M. at 1107 (footnote omitted).

In *NLRB v. Newman-Green, Inc.*, 401 F.2d 1 (7th Cir.1968), the employer announced a new employee life insurance plan to be paid for by the employer one month before the election. Five months earlier the employer had assigned an officer to investigate life insurance plans to be paid for by the company. The court upheld the Board's findings of violations, saying:

> When the employer chose to announce the insurance program at the time and under the circumstances here, it took the risk that its conduct could justify the inference the Board drew, that the preparation of the insurance plan and its promulgation was timed to induce, or did induce, votes against the Union.

401 F.2d at 3.

Finally, in *NLRB v. Styletek, Division of Pandel-Bradford, Inc.*, 520 F.2d 275 (1st

Cir.1975), the court made the following comment in upholding the Board's finding that the employer's need to revamp the wage structure for its rapidly growing work force did not rebut the presumption:

> The Board has often said that when economic circumstances call for wage changes and a representative election is pending, the employer should act as he would if the union were not on the scene.... The advice, as this case demonstrates, is obviously perilous unless the employer can support with very specific facts the reason for granting benefits just then.

520 F.2d at 281 n. 5.

The evidence presented at the election certification hearing shows that State Plating had made no prior announcement of scheduled raises; no decisions on raises had in fact been made. State Plating's history of wage increases shows two things: (1) State Plating granted frequent raises, often given to an employee twice or more in a year, and sometimes as often as every month, most often in April and September or October, so that had no election been held at least some employees would very probably have received raises during the two-month period prior to the election; but (2) the raises were granted inconsistently or even haphazardly, so that it was impossible to predict judging solely from the history when any particular employee would receive a raise or how much the raise would be. It would have been well nigh impossible for State Plating to rebut the presumption of illegal motive with respect to any raises it might have awarded before the election.[6] Any raise which State Plating might have given could have been considered designed to influence the election because the employee who received the raise would have had his uncertainties concerning his employer's evaluation of him assuaged.

---

6. The Board did not specify the raises it thought State Plating would have been allowed to give. This is perhaps due to the fact that no such specification is suggested by State Plating's history of granting wage increases. Unless both the amount and timing of particular raises are specified by the employer before the organizational campaign, however, the Board will consider *any* raises given during the campaign to have been improperly motivated.

The presumption of improper motive has only been found rebutted when the details of the raises were established before the start of the election campaign. For example, in *NLRB v. Hasbro Industries*, 672 F.2d 978 (1st Cir.1982), the employer had scheduled and listed on the payroll both the amounts and the timing of raises to be given particular employees. The court overturned the Board's finding that these raises, given just before the election but planned before it was known there would be an election, improperly influenced the election. Even then the Board had found the raises improper. This is also not a case such as *Havatampa Cigar Corp.*, 175 N.L.R.B. No. 109, 71 L.R.R.M. 1037 (1969), where an announcement of benefits the day before the election was found justified by the fact that management had decided on the benefits a month before the union petitioned for an election, but had to delay the announcement until after the plan was approved at a routine board of directors' meeting two days before the election.

 Waring's statement that State Plating could not award raises during the election campaign period would therefore appear to be correct, and the conclusions the employees understandably reached from Wesa's comments were wrong. The effect of Wesa's statement was to misrepresent the law to the employees.

We note that even if Wesa's comments were construed to be only a general statement of the law, that statement was incomplete and likely to mislead.[7] Wesa testified that she told the employees that "an employer's best approach in determining whether to grant a pay raise is to do what he normally would do if there had been no petition filed whatsoever." Wesa did not explain that any raises given before the election would be presumed to be motivated by a desire to affect the election. Especially in light of the strict application given

that presumption by the Board, we agree with the First Circuit that such advice "is obviously perilous unless the employer can support with very specific facts the reason for granting benefits just then." *Styletek*, 520 F.2d at 281 n. 5.

## V

 The Board's neutrality was destroyed by the NLRB agent's comment on a local issue which misled employees into believing that their employer had lied to them. The Board's findings to the contrary are not supported by substantial evidence. As the election was tainted by this failure of Board neutrality, the union was improperly certified.[8] Accordingly, the Board's application for enforcement of its bargaining order is denied.

---

7. The Board passed up an opportunity to remedy the incompleteness of Wesa's statement when State Plating asked the Board to give the employees a further explanation of the law regarding wage increases and the Board refused.

8. In view of our conclusion with respect to the effect of the NLRB agent's comments, we need not consider State Plating's arguments concerning a union representative's alleged misrepresentation and abuse of Board processes.