976 F.2d 733
 141 L.R.R.M. (BNA) 2312
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
and
Local 170, International Ladies' Garment Workers' Union, Intervenor,
v.
APEX PAPER BOX COMPANY, and Its Subsidiaries Boxit
Corporation, Western Reserve Packaging, Inc.,
North Coast Box & Container Corporation,
and Color Tech Coating and
Finishing Company, Respondent.
 No. 91-6189.
 United States Court of Appeals, Sixth Circuit.
 Sept. 17, 1992.
 
 Before KENNEDY and SILER, Circuit Judges, and JOINER, Senior District Judge.*
 SILER, Circuit Judge.
 
 
 1
 The National Labor Relations Board ("Board") petitions to enforce its order against Apex Paper Box Company and its subsidiaries ("Apex" or "Employer").
 
 The issues are whether:
 
 2
 (1) there was substantial evidence in the record to support the Board's finding that three laid-off employees were ineligible to vote in the election; and
 
 
 3
 (2) the Employer violated the National Labor Relations Act (29 U.S.C. § 158(a)(5) and (1)) by refusing to bargain with Local 170, International Ladies' Garment Workers' Union ("Union"), which the Board had duly certified as the employees' bargaining representative.
 
 
 4
 For the following reasons, the Board's petition to enforce its order is denied.
 
 I.
 
 5
 Employer manufactures retail packaging materials at several facilities in Cleveland, Ohio, including three Apex facilities. Until December, 1989, when a fire destroyed the Puritas Packaging facility ("Puritas"), Employer manufactured boxes at Puritas that were similar to those at its Apex facility. As a result of the fire, Puritas' building, machinery, and inventory were destroyed. Immediately after the fire, Employer found positions at its other facilities for three Puritas supervisors and one mechanic. The seven remaining employees, including the laid-off employees, were recalled prior to the March 30, 1990, election date; however, none of them were working during the payroll eligibility period.
 
 
 6
 According to Employer, after the fire: (1) its production needs had not changed; (2) no accounts had been lost; (3) the market remained the same; and (4) production requirements remained the same. Employer planned to immediately recover its lost production capacity using the existing employees. However, it did not know "what was going to happen," as Puritas was a "total loss." Furthermore, even though an additional machine was installed at an Apex facility to regain lost production capacity: (1) Employer did not have the ability to recoup the lost manufacturing; (2) there was no room for additional machinery at the other facilities; (3) the machines themselves were unavailable; and (4) there were no formal plans for rebuilding Puritas or expanding the existing facilities. The laid-off employees were informed that they had lost their jobs because of the fire, and were advised: (1) to complete job applications if they were interested in positions at an Apex facility; (2) that there were a limited number of current openings available at other facilities; (3) to remain in contact with Employer if they wished to be recalled; and (4) to contact the personnel department if they had any questions. In addition, Employer did not communicate with the laid-off employees regarding the work availability at any time prior to the end of the payroll eligibility period, but maintained a recall list. After the payroll eligibility period, but prior to the election, every qualified Puritas employee who filled out an application was recalled. Employees were recalled solely due to employee turnover. Employer had no policy or past practice of recalling laid-off employees. However, Employer previously, at another division, had hired temporary employees, who were informed they would not be recalled.
 
 
 7
 On January 23, 1990, the Union filed a representation petition with the Board seeking certification as the collective bargaining representative of a production and maintenance employees' unit at all of Employer's Cleveland facilities. On February 23, 1990, the Board directed Employer to file a list of all employees in the unit who were employed during the payroll period ending immediately before February 23, 1990, the date of the Decision and Direction of Election. Employer filed an original list, followed by a supplemental list, of employees' names and addresses, which included employees' names as of February 19, 1990. The laid-off employees' names were not on the list. After a vote of 97-96 for representation, with three additional challenged ballots,[1] the Board conducted a hearing and the Union maintained its challenges to the laid-off employees' ballots. The hearing officer recommended that the challenges to the ballots be sustained, and the Board affirmed the Regional Director's supplemental decision and certification of representative, sustaining the Union's challenges to the ballots of the laid-off employees.
 
 
 8
 Employer rejected the Union's bargaining request, and the Union filed an unfair labor practice charge. Then, the Board's General Counsel issued a complaint, alleging that the employer's refusal to bargain violated Section 8(a)(5) and (1) of the Act. Subsequently, the Board (by a 3-2 vote) ordered Employer to cease and desist from refusing to bargain with the Union and from interfering with, restraining or coercing employees in the exercise of rights guaranteed them by Section 7 of the Act. It further ordered Employer to bargain, on request, with the Union, as the exclusive representative of the employees in the bargaining unit. That is the order the Board seeks to enforce here.
 
 II.
 
 9
 29 U.S.C. § 159 provides the basis for the Board's authority to determine election conduct. The Board has "wide discretion" in establishing the procedure and safeguards necessary to "ensure the fair and free choice of bargaining representatives by employees." NLRB. v. Wyman-Gordon, 394 U.S. 759, 767 (1969); NLRB v. A.J. Tower Co., 329 U.S. 324, 330 (1946); NLRB v. Tennessee Packers, Inc., 379 F.2d 172, 180 (6th Cir.), cert. denied, 389 U.S. 958 (1967). Therefore, the court will not reverse the Board's election rules and policies unless it constitutes an abuse of discretion. Tony Scott Trucking, Inc. v. NLRB, 821 F.2d 312, 313 (6th Cir.), cert. denied, 484 U.S. 896 (1987); NLRB v. State Plating & Finishing Co., 738 F.2d 733, 737 (6th Cir.1984). This discretion extends to the Board's determination of voter eligibility through the use of its challenged-ballot procedure. NLRB v. Hardy-Herpolsheimer Div. of Allied Stores of Mich., Inc., 453 F.2d 877, 878 (6th Cir.1972). Thus, when a voter's eligibility is contested, "the burden is on the [objecting party] to show that the Board['s] determination ... was erroneous, not on the Board to prove it correct." NLRB v. Atkinson Dredging Co., 329 F.2d 158, 164 (4th Cir.), cert. denied, 377 U.S. 965 (1964). The burden requires the objecting party to "establish that the Board acted arbitrarily, capriciously, and abused its discretion, in order to warrant setting aside the resolution made by the Board." Hardy-Herpolsheimer, 453 F.2d at 878. Upon review, this court must determine if the agency's view is based on a permissible construction of the statute. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984). A court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding. FEC v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 39 (1981). Moreover, when a court reviews a Board decision, it must be upheld even if it represents a departure from the Board's prior policy, if it is rational and consistent with the Act. NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 787 (1990).
 
 III.
 
 10
 In determining whether an employee has a reasonable expectation of recall, the Board evaluated objective factors such as: (1) the past experience of the employer; (2) the employer's future plans; and (3) what the employee was told about the likelihood of recall. S & G Concrete, 1985 WL 45855, * 4 (N.L.R.B.); D.H. Farms, 1973 WL 4455, * 4 (N.L.R.B.).
 
 
 11
 "[W]here a substantial portion of the laid-off work force has been recalled, the finding that there was a reasonable expectancy of recall is warranted." Acme Industrial Co., 1976 WL 7643, * 2 (N.L.R.B.). Temporarily laid-off employees are eligible to vote if objective factors support a reasonable expectancy of recall in the near future, which establishes the temporary nature of the layoff. In addition, permanently laid-off employees, i.e., those with no reasonable expectation of recall, are ineligible to vote. Sol-Jack Co., 1987 WL 90037, * 2 (N.L.R.B.); Higgins, Inc., 111 N.L.R.B. 797, 799 (1955). In sum, the Board has long held that an employee must be employed and working in the unit on both the payroll eligibility period and on the election date to be eligible to vote in an election unless the employee is absent for reasons specified in the direction of election. See, e.g., Gator Products, 1980 WL 12034, * 1 (N.L.R.B.); F. & M. Importing Co., 1978 WL 7861, * 8 (N.L.R.B.); Ra-Rich Mfg. Co., 120 N.L.R.B. 1444, 1447 (1958). The Board's standard direction of election states, "Eligible to vote are those employed during the payroll period ... including employees who were ... temporarily laid off."
 
 
 12
 Although the general test for determining temporary layoff is reasonable expectancy of recall, the test is only a prediction. As the employees were recalled prior to the election, the reasonable expectancy of recall test is inapplicable, as a predictive test is not necessary. Nevertheless, the laid-off employees had a reasonable expectancy of recall, as: (1) their layoff was not due to either a temporary or permanent loss of business; (2) Employer's business remained strong, as steps to resume lost production and recall the laid-off employees were taken immediately; (3) Employer urged the employees to remain in contact with them; (4) every qualified employee who completed an application was recalled; and (5) the recalls took place both before and after the payroll eligibility cutoff date.
 
 
 13
 As the Board erred in applying the expectancy of recall test, and it is contrary to the fundamental principle assuring the right of employee self-determination, the Board's decision will not be enforced. The premise is based upon employees freely exercising their right to determine if they desire union representation and to have secret ballot elections by which they can exercise that right. See 29 U.S.C. § 157 (§ 7 of the Act); 29 U.S.C. § 159(c)(1) (§ 9(c)(1) of the Act). The laid-off employees' attempt to cast votes indicated their desire to participate in the election process.
 
 
 14
 The Board's findings of fact are conclusive if supported by substantial evidence. Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951). However, in this case, the findings that the three affected employees were permanently laid off are not supported by substantial evidence, where the employees returned to their previous jobs prior to the election and no bad faith on the part of Employer was indicated. Obviously, there could be instances where an employer attempts to "unit pack" through recall to influence the election, but the Board is free to scrutinize any such attempt and find the recall was made in bad faith. This was suggested in the dissent in this case by Board Member Devaney.
 
 
 15
 "We have held that laidoff employees who are rehired prior to the date of an election shall be considered as only temporarily laid off, and therefore eligible to vote in the election." Sylvania Electric Products, Inc., 91 N.L.R.B. 296, 297 (1950). Unlike Gerber Plastic Co., 110 N.L.R.B. 269 (1954), the laid-off employees in this case were not rehired to different jobs, but were recalled to their former positions. Further, Gerber never intended to overrule Sylvania "in all respects," but only to the extent Gerber was inconsistent. Gerber, 110 N.L.R.B. at 272. Thus, the laid-off employees, who were recalled and working prior to the election, were only temporarily laid off. Accordingly, the Board's order will not be enforced.
 
 
 16
 KENNEDY, Circuit Judge, concurring.
 
 
 17
 I am unable to agree with the majority that
 
 
 18
 [a]lthough the general test for determining temporary layoff is reasonable expectancy of recall, the test is only a prediction. As the employees were recalled prior to the election, the reasonable expectancy of recall test is inapplicable, as a predictive test is not necessary.
 
 
 19
 The Supreme Court has accepted the Board's use of an eligibility date prior to a representation election. NLRB v. A.J. Tower Co., 329 U.S. 324, 330-31 (1946). I agree that the concerns which support such a date for new hires are not as strong for laid-off workers, i.e., there is less danger of unit packing, less difficulty in ensuring adequate communications and informed decision making. But I cannot say that the Board's decision to use an eligibility date fails our extremely deferential standard of review. The Board could have a rational basis for concluding that without the elibibility cut-off date, employers would have too much latitude to pack units. For example, even when using seniority lists, a company could recall groups of employees in particular departments or crafts. At a minimum, including laid-off workers in the pool of potentially eligible voters during the eligibility period puts an additional burden on both sides to disseminate information. This burden may fall more heavily on the union, by increasing the size of the campaign.
 
 
 20
 However, I concur in the refusal to enforce the Board's order because its conclusion that there was no expectancy of recall for the three employees whose votes are in contention, is not supported by substantial evidence based on the record as a whole.
 
 
 21
 There is no dispute that after the fire occurred at the Puritas plant on December 18, 1989, the employees who were interested in continued employment were told to make that fact known to the employer and that before the eligibility date of February 19, 1990, eight of them had been recalled. Four of those recalled were supervisors, three of whom took non-supervisory jobs either as machine operators or on the conveyor line. The other four recalled were recalled to the same type of jobs they had had before as machine operators or on the conveyor line. Thus, seven were recalled to bargaining unit jobs. These seven jobs were not new jobs, rather these workers replaced other employees who left their jobs. The recalled employees were given their earlier seniority dates, which affected their medical coverage, vacation, and wage rates; wages increased with length of service. With a bargaining unit of at least 390 employees (the number voting in the election) and jobs that paid less than $5.00 per hour, turnovers must be expected. The only evidence as to the rate of turnover before the eligibility date is seven from January 1st to February 19th. There were no extraordinary circumstances during this period. The company was operating a full production and had plenty of orders. Indeed, had the employer failed to fill the jobs left open by employee turnover, it might well be charged with manipulating the bargaining unit.
 
 
 22
 The Board applies an objective test in determining as of the eligibility date whether there is an expectancy of recall. Tony's Trailer Service, 257 N.L.R.B. 878 (1981). Although the expectancy must be determined as of the eligibility date, it is the expectancy that the employee will be recalled before the election date or in the near future after that date that must be decided. The purpose of applying the test is whether the laid-off employee should be permitted to vote in the election. Here, the expectancy of recall depended upon attrition due to employees leaving. Since the company was recalling employees based on their seniority, the employees who had an expectancy of recall through employee turnover could be identified from the seniority list.
 
 
 23
 The majority of the Board found that turnover of employees was fortuitous. While the exact number of employees who would leave during any particular time period may have been fortuitous, that is, happening by chance or accident, occurring unexpectedly or without known cause, that there would be some turnover was not unexpected. The Board knew of the turnover during the six weeks prior to the eligibility date. It was six weeks until the election. The "near future" after the election which must also be included in the expectancy formula should surely include another six weeks for laid-off employees. Under the circumstances here, I believe the only reasonable conclusion that could be drawn was that there was an expectancy that at least three employees would be recalled during that 12-week period. Actually all the laid-off workers who wished recall were recalled before the election date here.
 
 
 24
 The parties devote considerable discussion to the significance of their prior positions with regard to the eligibility of these three employees to vote. At the time of the election, the union wanted their votes counted and the employer did not, while later they reversed their positions. It seems to me that discussion is extraneous to the issue here. Our primary concern should be the right of these employees to vote. Unless the positions of the parties affected the expectancy of recall, they are irrelevant. Their positions were not one of the circumstances existing at the time of the eligibility date, the date at which the Board determines whether an employee will be recalled before or in the near future after the election.
 
 
 25
 In summary, because the evidence compels the conclusion that there would be attrition of the work force in the weeks between the eligibility date and the election and in the "near future" after the election, and that the employer would fill those positions as quickly as possible from the list of laid-off employees, the three employees concerned had an expectancy of recall. Accordingly, I also would deny enforcement of the Board's order.
 
 
 
 *
 The Honorable Charles W. Joiner, Senior United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The original vote was 96-94 for representation, with six challenged ballots. The Union withdrew its challenge to three ballots, resulting in the 97-96 vote